THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
PAMELA RAY, Defendant-Appellant.

Fifth District   No. 78-454

Opinion filed December 27, 1979.

Richard J. Wilson and Daniel D. Yuhas, both of State Appellate Defender's Office, of Springfield, and Janet Sinder, law student, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Raymond F. Buckley, Jr., and Curtis L. Blood, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

The defendant, Pamela Ray, appeals from her conviction of murder before the circuit court of St. Clair County. The defendant was also convicted of cruelty to children in violation of section 53 of division I of the Criminal Code of 1874 (Ill. Rev. Stat. 1977, ch. 23, par. 2368). Defendant was sentenced to concurrent sentences of 20 years' imprisonment on the murder conviction and two years' imprisonment on the cruelty-to-children conviction.

During the morning of March 12, 1978, Sheritta Agnew, defendant's 17-month-old daughter, died. Between 11 and 11:30 a.m., the victim was taken by ambulance to the hospital where she was pronounced dead on arrival. An autopsy determined that the immediate cause of death was acute cerebral edema, which was caused by multiple blunt injuries to the

head. Cerebral edema is a lesion which may result from different types of injuries. Blood supplied to the brain is increased by inflammation. A collection of fluid occurs in the brain, and the collection is not removed as rapidly as it accumulates. The foregoing causes the brain to swell. As the brain swells it literally compresses its own blood supply, which in turn shuts off the brain's oxygen supply and brings about respiratory arrest. The head injuries were caused by more than one blow and were inconsistent with a single fall. The victim also suffered multiple contusions and abrasions of the face and trunk, extensive second-degree burns on the right ankle, moderate dehydration and malnutrition, and early acute bronchial pneumonia; however, Dr. Parks, who performed the autopsy, was of the opinion that the foregoing injuries were not the cause of death. Scalding could have produced the burns around the buttocks, pelvic area, and anterior thighs. Linear contusions across Sheritta's back may have been caused by a narrow cord or a belt. There was a bruise on her back which outlined a hand or fingers. There was extensive swelling and bruises around her head and neck, and both eyes had been blackened. There were six contusions on the right temporal area of the head and several more on the left temporal area. Sheritta suffered approximately 11 burns, which may have been caused by cigarettes. Dr. Parks was of the opinion that the bruises and burns were inflicted by a series of multiple traumas, which were not inflicted by Sheritta.

Defendant told the ambulance driver that she and Norvelle Hicks, with whom she was living, found Sheritta dead when they got up in the morning. After being asked by the ambulance driver, defendant declined to accompany the body to the hospital. The ambulance driver was instructed to bring defendant to the hospital, and she was taken to the hospital at approximately half past noon.

When Albert Ransom, deputy coroner of St. Clair County, first asked defendant what had happened to Sheritta, she shrugged her shoulders and shook her head to indicate that she did not know. The second time he asked, defendant responded that she had given Sheritta a bath and skin came off her feet. When the body was taken to the emergency room, defendant was again asked what happened, and she responded that she did not know. Mr. Ransom then asked her about defendant's black eye, and she responded that her boyfriend did it. She was then asked if the boyfriend harmed the baby, and she shook her head indicating that he did not.

Three members of defendant's family testified that they noticed Sheritta's head injury and belt marks on her back approximately one week before she died. Norvelle Hicks was described as being six feet four inches tall and weighing 190 pounds. Defendant's mother testified that since defendant met Hicks, she did not care for her children (defendant

has three other children besides Sheritta) as well as before she met Hicks.

Detective Guyton of the East St. Louis Police Department arrived at the hospital at approximately 4 p.m. She also asked defendant three or four times what happened, and defendant responded each time that she did not know. Defendant was arrested. After being given her *Miranda* rights, defendant gave a statement to Detective Guyton between 1:20 and 3:30 a.m. the next morning. Pretrial motions to suppress defendant's statements were denied. She stated that Sheritta did not like Norvelle Hicks and that he commenced to make faces at her in order to scare her. In November 1977, he whipped Sheritta for the first time. During the week of February 19, 1978, Hicks hit Sheritta in the face and knocked her down. He hit her three more times with his hands before defendant told him to stop. The next day Hicks hit Sheritta with a belt all over her body. After the foregoing, Sheritta's head began to swell. On March 8, 1978, Hicks hit Sheritta with his fists on her head and arms. He beat her for approximately 15 minutes. At one point Sheritta ran into the refrigerator in order to get away from Hicks. On March 9, 1978, Hicks burnt Sheritta with a cigarette on her neck and arms. Defendant finally took the cigarette from Hicks. On March 10, 1978, Hicks twice beat Sheritta and kicked her. The first time defendant stopped the beating, and Hicks stopped voluntarily the second time. The foregoing incidents of abuse were precipitated by Sheritta's crying or wetting her pants. On March 11, 1978, Hicks put Sheritta in hot bath water while defendant watched television. Sheritta fell down and was unconscious for a couple of minutes. When they awoke on the 12th they found Sheritta dead. Defendant walked to a liquor store and called the ambulance. Hicks put nice, clean clothes on Sheritta.

At 11:30 a.m. on March 13, 1978, defendant gave a second statement to Sergeant Brewer. Pretrial motions to suppress this statement were also denied. Defendant stated that on March 10, she had beaten Sheritta with an extension cord and that she, not Hicks, had drawn the bath water; however, it was not until a half hour later that Hicks put Sheritta in the still-hot bath water. Sheritta fell while in the tub and swallowed some water.

The court found defendant guilty of felony-murder, the felony being aggravated battery. The court further found that the evidence was sufficient to convict defendant as both a principal and an accessory.

Defendant initially contends that defendant's statements were obtained in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Defendant contends that she was in custody when she was being questioned by Detective Guyton and Deputy Coroner Ransom, because she was arrested immediately after stating that she did not know what happened to Sheritta. Defendant reasons that if probable

cause existed at the time of the arrest, it also existed at the time the statements were made, as the statements were exculpatory.

■■ Since *Miranda,* courts of review have often experienced great difficulty in fixing the time when, absent formal charge or arrest, custody of a defendant is established. A proper analysis of whether an arrest has been effected should consider (1) the amount of knowledge possessed by the police at the time of interrogation, (2) the tone and method of questioning, and (3) who, if anyone, was the focus of the investigation at the time of the investigation. (*People v. Bailey* (1973), 15 Ill. App. 3d 558, 304 N.E.2d 668.) In *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870, our supreme court indicated that the elements of a valid arrest were present when the police informed defendant of a violation, defendant submitted to their control, and the evidence clearly shows that the police intended to effect the arrest and that defendant so understood them. The accepted test of understanding is not what the arrestee thought, but "what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes."

■■ In the case at bar, the court denied defendant's motion to suppress her statements. We believe that there is sufficient basis in the record to support the trial court's ruling. We cannot say that a reasonable, innocent person, under like circumstances, would have had cause to believe herself arrested during the initial interview with Guyton and Ransom. Defendant went to the hospital voluntarily while accompanied by an ambulance driver. The questions asked were for the purpose of finding out how Sheritta came to have the many marks of violence on her. The initial questioners were medical personnel, not police officers. There were none of the procedures which the public associates with arrest—searching, booking, fingerprinting—which might, to an innocent person, have negated the impression that she was simply being interrogated to learn what happened to Sheritta. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 386 N.E.2d 870, 873.) An innocent person could reasonably have concluded that the police viewed her as an important witness, and that they intended to, and expected to, elicit her cooperation. The police viewed defendant as an important witness because she was the mother of deceased and because her black eye indicated that she also had been battered. After defendant repeatedly denied that she knew how Sheritta received her injuries and said her boyfriend had hit defendant but not Sheritta, then defendant was arrested. The fact that defendant could not give an explanation of how the injuries were inflicted coupled with the knowledge that the dead child was taken from defendant's home would lead a reasonable person to believe that defendant was trying to cover up her involvement in the death of Sheritta, and probable cause then existed to arrest defendant.

■■■ Defendant's last contention is that the evidence did not prove her guilty of murder beyond a reasonable doubt. In Illinois, aggravated battery upon the victim may serve as a basis for felony murder under section 9—1(a)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(3)). (*People v. Viser* (1975), 62 Ill. 2d 568, 343 N.E.2d 903.) A person may be convicted of felony murder even though he had no intent to and did not personally kill the victim. (*People v. Miner* (1977), 46 Ill. App. 3d 273, 360 N.E.2d 1141.) Section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 5—2) defines accountability as:

"Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

To bring the accused within the purview of this section, it must be established that: she solicited, aided, abetted, agreed or attempted to aid another person in planning or committing an offense; that this participation took place either before or during the commission of the offense; and that the participation was with the specific intent to promote or facilitate the commission of the offense. (*People v. Cole* (1977), 50 Ill. App. 3d 133, 365 N.E.2d 133; *cert. denied* (1978), 435 U.S. 944, 55 L. Ed. 2d 541, 98 S. Ct. 1526.) Mere presence at the scene of the crime or negative acquiescence in another's action is insufficient to make a defendant accountable, but one may aid and abet without actively participating in the overt act. (*People v. Cole; People v. Clark* (1963), 30 Ill. 2d 67, 195 N.E.2d 157. See also *Mobley v. State* (1949), 227 Ind. 335, 85 N.E.2d 489, which has a factual basis not unlike the case at bar.) If the proof shows that a defendant was present at the commission of the crime without disapproving or opposing it, the trier of fact may consider this conduct in connection with other circumstances and reach the conclusion that the accused assented to the commission of the crime, lent to it her countenance and approval, and was thereby aiding and abetting it. (*People v. Cole; People v. Kolep* (1963), 29 Ill. 2d 116, 193 N.E.2d 753; *People v. Bracken* (1966), 68 Ill. App. 2d 466, 216 N.E.2d 176; *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, *cert. denied* (1977), 434 U.S. 927, 54 L. Ed. 2d 287, 98 S. Ct. 411.) Even in the absence of any evidence that defendant committed an overt act, the trier of fact could still have found her accountable for the actions of Hicks where uncontradicted evidence established her continued close association with Hicks and her failure to report to authorities any of the incidents of Hicks' abuse of Sheritta. The foregoing was evidence that defendant shared the common purpose of Hicks and was sufficient to sustain her conviction for the acts of Hicks. (*People v. Cole; People v. Clark*.) In the absence of explanation, such conduct is not consistent with that of an innocent person similarly

situated, and is sufficient to support an inference that a common understanding or design to abuse Sheritta over a period of time existed between Hicks and defendant. (*People v. Thicksten* (1958), 14 Ill. 2d 132, 150 N.E.2d 813; *People v. Kolep*.) If the circumstances show a common design to engage in an unlawful endeavor, whatever one does in furtherance of the endeavor is the act of the other. *People v. Glass* (1959), 16 Ill. 2d 595, 158 N.E.2d 639, *cert. denied* (1960), 361 U.S. 937, 4 L. Ed. 2d 357, 80 S. Ct. 379.

● 6, 7 Here, the evidence established that the severe beatings inflicted upon the child by Hicks commenced at least one month before the child's death. Evidence established that defendant moved into Hicks' home approximately one week before Sheritta's death when she reasonably knew that Sheritta would be exposed to abuse and torture by Hicks. Defendant did not try to get medical help for her daughter, nor did she take her from the injurious environment; on the contrary, on the date that Hicks twice beat and kicked Sheritta, defendant beat Sheritta with an extension cord. In light of the foregoing circumstances, we are persuaded that defendant did not want to permanently disassociate herself from Hicks at any time prior to the death of Sheritta. Rather, she desired to be present, and even participate in the torture and abuse of her child. Defendant only asked Hicks on one occasion to stop his abuse after the child had been severely beaten. Although it is generally true that the proof tending to show one to be an accessory before the fact would be events occurring before the inflicting of the fatal blows, evidence of subsequent acts is nonetheless competent to prove participation in the battery of Sheritta. (*People v. Kolep*.) In this case defendant did not call or go to the police station to report the crime. She did not accompany the body to the hospital, which we infer was an attempt to avoid being questioned about the death and injuries of the child. When later she did go to the hospital and was questioned, she initially stated that she did not know how the injuries were inflicted. Under the foregoing circumstances, the trier of fact was justified in concluding that defendant subscribed to Hicks' unlawful venture which fostered an atmosphere of violence and, as a natural consequence, resulted in the death of Sheritta Agnew. We also consider that defendant's continued presence, while the victim was being beaten, and her subsequent attempted cover-up, are sufficient to show a " 'common design to do an unlawful act to which all assent.' " (See *People v. Morgan* (1977), 67 Ill. 2d 1, 10, 364 N.E.2d 56, *cert. denied* (1977), 434 U.S. 927, 54 L. Ed. 2d 287, 98 S. Ct. 411.) For the foregoing reasons, we affirm the judgment of the circuit court of St. Clair County.

Affirmed.

KARNS and KASSERMAN, JJ., concur.