THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARIO SALDANA, Defendant-Appellant.

Second District   No. 85—0296

Opinion filed August 11, 1986.

Stephen R. Kramer and Richard J. Rubin, both of Kramer & Rubin, of Chicago, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Kenneth R. Boyle, of State's Attorneys Appellate Prosecutor, of Springfield, and William L. Browers and Dale M. Wood, both of State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

JUSTICE STROUSE delivered the opinion of the court:

The defendant, Mario Saldana, appeals from a conviction following a jury trial of the unlawful delivery of a controlled substance (Class X) and conspiracy to deliver. He was given the minimum sentence of six years' imprisonment.

On the evening of June 5, 1984, several police personnel proceeded to the residence of Daniel Quinn in Lake in the Hills. Robert Pietrowski, a Chicago police officer assigned to the Drug Enforcement Administration (DEA) as an undercover agent, went to the residence to purchase lysergic acid diethylamide (LSD) from Quinn, who was the subject of an ongoing criminal investigation. Pietrowski, accompanied by a confidential informant, was observed entering the Quinn residence, where he remained for 10 minutes. After a meeting with fellow officers at the Lake in the Hills Airport, Pietrowski returned to Quinn's residence. Pietrowski, Quinn, and the confidential informant travelled by car to a Dairy Queen restaurant in Elgin.

James R. Marino, a Chicago police officer assigned to the DEA as a surveillance officer, watched as Quinn purchased ice cream, walked to the rear of the parking lot and disappeared. Quinn reappeared five minutes later, walked to the undercover vehicle and conversed with Pietrowski. Again Quinn walked out of sight. After Quinn returned and left a third time, he reentered the car and left the area with Pietrowski and the confidential informant. Officer Marino did not observe the defendant prior to the trial, did not know where Quinn went after leaving the undercover vehicle, and did not know what Quinn was doing when he was out of his line of vision. During cross-examination, defense counsel requested the name of the confidential informant. The trial court denied his request but allowed him to question Marino concerning whether he knew the informant and what he did.

Claudia Rang, a police officer from the village of Algonquin, also assisted in the surveillance. She observed the undercover vehicle, a

jeep, and watched as Quinn exited the jeep and walked over to a green Ford Maverick. After conversing with someone in the Maverick, Quinn walked back to the jeep. Quinn later returned to the Maverick, entered it, and the car drove away. She saw Quinn walking back to the jeep approximately five minutes later. Quinn walked back to the Maverick a third time, where there was some conversation and he returned to the jeep. When Quinn left the jeep, the Maverick also drove away from the restaurant. Officer Rang was only able to observe the silhouette of the individual in the Maverick and could not identify that person. The lighting was "dim" around the Maverick. She did not see anything in Quinn's hands, nor did she observe anything being passed. She did see Quinn appear to tuck in his shirt.

Lieutenant Steven Schinkel of the Algonquin police department was also involved in the surveillance operation that evening. He observed Quinn enter the Maverick, talk to the driver and return to the jeep. He later observed Quinn enter the Maverick, and he followed the vehicle as it drove around the block and returned. As Quinn exited the Maverick, he rearranged his pants and stuffed a white object into them. He observed this from a distance of 50 feet as the interior dome light of the Maverick illuminated the area where Quinn was standing. Schinkel saw Quinn return to the Maverick a third time, enter it and return to the jeep. The green Maverick then left the area. Schinkel identified the defendant as the driver of the green Maverick. Defense counsel then stipulated that the defendant was at the Dairy Queen at that time. Schinkel did not know what was in the white package or object and he did not mention a "white object" in his police report. Schinkel further testified he did not observe the defendant hand anything to Quinn.

Agent Pietrowski testified that after proceeding from Quinn's residence to the restaurant with Quinn and the confidential informant, he parked and remained in the jeep for 30 minutes. Quinn got out of the jeep, and Pietrowski lost sight of him for several minutes. After Quinn returned to the jeep a second time, he pulled up his shirt to reveal an item wrapped in a white napkin. Pietrowski observed a number of papers containing orange-colored flying saucer symbols on each paper. There were approximately one hundred "hits" of LSD on each slab of paper. The papers were handed by Quinn to the confidential informant, who counted the number of "hits" as Pietrowski watched. The informant handed the papers back to Quinn and Pietrowski showed Quinn $1,696. Quinn exchanged the LSD for the money. Quinn left the jeep, later returned and then Pietrowski, Quinn, and the informant drove back to Quinn's residence.

Over defense counsel's objection, Pietrowski was allowed to testify under the co-conspirator exception to his hearsay conversations with Quinn. Again, defense counsel requested the informant's name, and the trial court would not allow disclosure. Pietrowski related that while he was at Quinn's residence, Quinn said "he just spoke to Mario and Mario wanted to do the deal a little later in the evening when it was darker." At the restaurant, upon Quinn's first return to the jeep, Quinn told Pietrowski that "Mario was here and he wanted the money." Pietrowski, however, wanted to see the "acid" before he gave the money. Quinn responded that he "would go over and talk to Mario and see if it was okay to check it out." After the delivery of LSD had taken place, Quinn told Pietrowski he "would take the money to Mario and be right back." On cross-examination, Pietrowski admitted he neither met nor observed the defendant.

Sanford Angelos, a forensic chemist with the DEA, testified that the weight of the exhibit was 15.89 grams. It was his opinion that the exhibit submitted contained LSD. The chemist did not perform tests on each and every paper or sheet of the evidence submitted for analysis and identification. Mr. Angelos first weighed the entire exhibit and then weighed the 20 sheets of white paper on a top-loading electronic scale. The scale is checked every day with an internal calibration of zero and 101, and on a monthly basis with standard class-S weights, and yearly from an outside source which certifies all of the balances. Defense counsel stipulated that the scales were functioning properly. Counsel also stipulated that the 20 sheets with the symbols contained LSD. Each sheet was then examined by ultraviolet light under which LSD fluoresces a blue color. The fluorescents will spot whether the sheet is totally or partially coated. In his scientific opinion, based on a reasonable degree of scientific certainty, all 20 sheets had LSD evenly distributed over the surfaces. Mr. Angelos then did a high-pressure liquid chromatography test. Under that test he quantitated the material of each component, and, within a reasonable degree of scientific certainty, he opined that the concentration was 23 micrograms of LSD per dosage unit. It was Mr. Angelos' opinion that the third test, a gaschromatography mass spectroscopy, showed that the contents were LSD. At 23 micrograms per dosage unit the sheets would weigh a total of 15.89 grams. Each piece of blotting paper was perforated so that there were 20 squares approximately one-quarter inch on each side on each paper so that the total number of dosage units was 2,000. Mr. Angelos stated that he used a standard method of sampling regularly used in the pharmaceutical industry to assure a random sample. Since each paper was uniformly coated, it appeared that the

paper had been dipped in LSD. He testified that using this method of random sampling each sheet had an equal chance of being selected and each dosage unit had the same chance of selection.

After the defendant's motion for a directed verdict was denied, the defense called to the stand their only witness, Maria Nosek, for the purpose of impeaching Officer Schinkel's testimony concerning the interior light in the Maverick. Nosek testified that she owned the green Ford Maverick that was driven by defendant the evening of June 5, 1984, and that the interior dome light was not operating on the night in question and had not worked since May 1981.

The jury found the defendant guilty of unlawful delivery of a controlled substance and conspiracy. The defendant's motion for a new trial was denied. Thereafter, the defendant was sentenced to a six-year term of imprisonment for the unlawful-delivery offense only, the conspiracy having been deemed to merge with the delivery charge.

The defendant's first argument on appeal centers around the trial court's refusal to reveal the identity of a confidential informant who was present at and participated in the drug transaction. The defendant contends generally that the materiality of the confidential informant's testimony was potentially crucial for his defense. He relies on *Roviaro v. United States* (1957), 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623, where the informant had taken a material role in bringing about the defendant's possession of heroin. In that case, the informant played a material role as the sole participant with the defendant in the transaction and was the only witness to amplify or contradict the testimony of the government witness. 353 U.S. 53, 64-65, 1 L. Ed. 2d 639, 647-48, 77 S. Ct. 623, 629-30.

The Illinois Supreme Court in *People v. Lewis* (1974), 57 Ill. 2d 232, 235, adopted the *Roviaro* standard, holding that disclosure would be required when an informer acted in the dual role of informer-participant. Only the purchasing agent, the defendant, and the informer were present at the drug sale. Since the informer was the only witness to amplify or contradict the testimony of the government witness, the defendant should have been allowed to interview him. 57 Ill. 2d 232, 238; see also *People v. Perez* (1974), 25 Ill. App. 3d 371, 374-75.

■ Here, the informant did not witness the drug transaction; did not assist in staging the transaction; did not observe what each participant did in consummating the transaction; nor could the informant identify the defendant as he never saw, heard, or talked with the defendant. The informant's only involvement in the transaction was to sit in the car and count the number of "hits" of LSD contained in a

napkin passed from Quinn to Agent Pietrowski. We find the informant was not a material witness and, therefore, the trial judge correctly refused to require that the State reveal his name.

The defendant next argues that the hearsay statements of the co-conspirator should not have been admitted because the State failed to prove a *prima facie* case of conspiracy first by independent evidence.

■ Under the co-conspirator exception to the hearsay rule, the acts and declarations of a co-conspirator made in furtherance of the conspiracy are admissible against a defendant even when made out of the defendant's presence. (*People v. Simpson* (1976), 39 Ill. App. 3d 318, 321.) In order to avail itself of the exception, the State is required to establish a *prima facie* case by independent evidence that two or more persons were engaged in a common plan to accomplish a criminal goal or to reach another end by criminal means. There is no mandatory rule that the independent evidence of the conspiracy be introduced prior to the admission of the co-conspirator's declaration. (*People v. Goodman* (1980), 81 Ill. 2d 278, 284; *People v. Cortes* (1984), 123 Ill. App. 3d 816, 822.) The existence of the agreement, which is the essence of a conspiracy, need not be proved by direct evidence, but may be inferred from all the surrounding facts and circumstances. *People v. Miller* (1984), 128 Ill. App. 3d 574, 585.

■ We find the testimony of the police officers as to the peculiar sequence of Quinn's actions at the restaurant and his contacts with the defendant supports the trial court's finding that a *prima facie* case of conspiracy existed and precludes, as the defendant argues, any reasonable inference that the defendant was "merely present" or an "innocent bystander."

The defendant next contends that the evidence is insufficient to support a conviction of unlawful delivery based on an accountability theory. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. Rather, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 106 Ill. 2d 237, 261.

In order to hold a defendant accountable for the conduct of another, the State must prove beyond a reasonable doubt that: (1) defendant solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) this

participation must have taken place either before or during commission of the offense; and (3) it must have been with the concurrent, specific intent to facilitate or promote the commission of the offense. (*People v. Schlig* (1983), 120 Ill. App. 3d 561, 570.) Mere presence at the scene of a crime, even the knowledge that a crime is being committed, or negative acquiescence is not enough to constitute a person as a principal, but one may aid and abet without actively participating in the overt act. *People v. Ray* (1979), 80 Ill. App. 3d 151, 156.

We conclude that there was sufficient evidence to support the jury's verdict. The evidence shows that the defendant aided Quinn in planning and committing the offense, that his participation was both before and during the delivery, and that this was done with the specific intent to facilitate commission of the offense. (Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c).) We note the jury may consider the reasonableness of the defense offered and may reject that evidence when it finds it contradictory, unlikely, or improbable in light of other facts before it. *People v. Eliason* (1983), 117 Ill. App. 3d 683, 696.

The defendant next argues that the charge should be reduced and the sentence modified because the State did not prove beyond a reasonable doubt that the papers analyzed and introduced into evidence contained 15 or more grams of LSD. Since the combined weight of the 20 sheets of paper introduced was 15.89 grams and less than one gram could make the difference in classification from a Class X felony to a Class 1 felony, the defendant contends a portion of each sheet should have been tested. The State contends that it did prove beyond a reasonable doubt that each sheet contained LSD, uniformly distributed over each surface, and the fact that only a portion of any material is positively identified as containing a controlled substance goes to the weight of the evidence, not its admissibility. We agree.

The State relies on *People v. Ohley* (1973), 15 Ill. App. 3d 125, and *People v. Yosell* (1977), 53 Ill. App. 3d 289, in which a similar issue was presented. In both cases, the issue was how many of a group of tablets had to be tested in order to prove beyond a reasonable doubt that the other tablets not tested contained the same substances as those tested. In *Ohley,* 89 tablets allegedly contained LSD. An examination of a random sample revealed they were homogeneous and contained an indole compound. The remaining tablets had the same outward appearance and markings as those tested. A definite test of six randomly chosen tablets revealed the presence of LSD. The court observed that if no pills were subjected to the definite test the State would have been unable to prove the existence of LSD. If all the pills were tested, it would have resulted in destruction of all the evidence.

The court held that the fact that the pills introduced into evidence were not positively identified as LSD goes to the weight of the evidence; it does not destroy their probative value when coupled with expert opinion testimony. (*People v. Ohley* (1973), 15 Ill. App. 3d 125, 130-31.) Similarly, in *Yosell*, 10 bags containing approximately 100 capsules each were recovered. One chemist analyzed 6 randomly selected capsules and another analyzed 10 capsules, one from each of the 10 bags. Test results indicated that each capsule which was analyzed contained a controlled substance. The court concluded that the question of whether the entire substance was a derivative of barbituric acid was a question for the trier of fact to resolve, and, noting that the testimony was uncontradicted, the court found no reasonable doubt concerning the finding. *People v. Yosell* (1977), 53 Ill. App. 3d 289, 293; see also *People v. Kline* (1976), 41 Ill. App. 3d 261, 267.

■ The tests here, along with the uncontroverted expert opinion testimony, were sufficient to prove beyond a reasonable doubt that all the sheets contained LSD. The evidence regarding the uniformity of the LSD on all of the sheets was uncontradicted. The forensic chemist, in analyzing the sheets, took randomly calculated dosage units after all of the sheets were subjected to ultraviolet spectroscopy and determined to have LSD uniformly distributed over their surface. We find that the evidence was sufficient to sustain the verdict of the jury.

Defendant next contends that during the State's closing and rebuttal arguments, the prosecutor made five impermissible references to the defendant's decision not to testify. The State first responds that any alleged errors have been waived due to the defendant's failure to object to them during trial.

A close examination of the record reveals the following relevant portions. During closing argument, the prosecutor, in discussing the evidence presented by the State on the conspiracy count, stated: "It's clear, ladies and gentlemen, that the second count of conspiracy had also been proven beyond a reasonable doubt. And I want you to think about and I want you to remember, and you will get the instruction to the effect that the defendant, of course, has nothing to prove. The State has all the burden of proof. The defendant does not have to present any evidence, but what was the defense in this case? What is the point?" The prosecutor further commented on the lack of any defense in the case and since there was little evidence, defense counsel could only attack the State's witnesses. "Why do you attack all these people? Because there's nothing else to say." The prosecutor went on to say, "I want you to think about back when [defense counsel] opened up his case and gave you an opening statement. And, of course, none

of that is evidence, as I told you before, none of that is evidence. The only evidence is what comes from over here. They don't have to prove anything. What did he say? He told you his client remembered vividly what happened that night. There is no evidence." Defendant did not object to any of these statements.

During defendant's closing argument, defense counsel argued:

"[M]aybe [he] got an ice cream cone, maybe he didn't. Who knows. The evidence says Quinn came over to his car. What did Quinn say to Mario? Who knows. Maybe Quinn said, I like the blonde or I like the brunette."

The prosecutor stated, in rebuttal, "I don't want you to get involved whether or not Mario Saldana was there to pick up chicks. *** We are not talking about what maybe happened. Of course you realize he doesn't have to take the stand. The burden is on me, and I accept that burden; but maybe, maybe this and maybe that. It's not in evidence. It completely should not be regarded by you for any purpose. You never heard anybody say that. Never did anybody give any indication of any of those maybe's or possibilities." Again, defense counsel never objected at any stage of the final arguments to the comments the defendant now complains are prejudicial to his case.

■ The defendant has waived this issue by failing to timely object to any of the remarks when they were made. (See, *e.g., People v. Bartall* (1983), 98 Ill. 2d 294, 321; *People v. Jenkins* (1983), 117 Ill. App. 3d 33, 43.) Arguments which are considered inflammatory may, however, warrant reversal when they prevent the defendant from receiving a fair trial or cause substantial interference with the fundamental integrity of the judicial process. *People v. Bartall* (1983), 98 Ill. 2d 294, 321.

The appropriate test for determining whether a defendant's right to remain silent has been violated is whether the reference was intended or calculated to direct the jury's attention to the defendant's neglect to avail himself of his legal right to testify. (*People v. Dixon* (1982), 91 Ill. 2d 346, 350; *People v. Miller* (1983), 120 Ill. App. 3d 495, 503.) The prosecutor may comment on the uncontradicted nature of the State's case. (120 Ill. App. 3d 495, 503.) A prosecutor's closing argument may denounce the accused and reflect upon witness credibility if it is based on facts in the record or inferences fairly drawn from those facts. (*People v. Bryant* (1983), 94 Ill. 2d 514, 523-24.) It is also proper for a prosecutor to point to a defendant's failure to submit any evidence that would tend to refute the case against him. (*People v. Albanese* (1984), 104 Ill. 2d 504, 522.) While prosecutors may not engage in inflammatory and unfounded closing arguments, each

case must be decided upon its own facts. *People v. Bryant* (1983), 94 Ill. 2d 514, 523.

■ We find that the prosecutor's comments during closing argument were within permissive bounds. The comments complained of do not constitute a direct reference to the defendant's failure to testify, such as occurred in *People v. Chellew* (1968), 104 Ill. App. 2d 100, 105-06, cited by the defendant. In the context of the entire closing argument, the prosecutor was merely demonstrating the absence of any evidentiary basis for defense counsel's opening statement.

■ The State's rebuttal was also permissible argument. The prosecutor may comment on the uncontradicted nature of the State's case, and, where motivated by a purpose of demonstrating the absence of any evidentiary basis for defense counsel's argument rather than a purpose of calling attention to the fact that defendant had not testified, such argument is permissive. (*People v. Dixon* (1982), 91 Ill. 2d 346, 350.) Moreover, the defendant cannot claim error where the prosecutor's remarks are in reply to and may be said to have been invited by defense counsel's argument. 91 Ill. 2d 346, 350-51; *People v. Miller* (1983), 120 Ill. App. 3d 495, 504.

■ We find it significant in this case that the jury was instructed not to take defendant's failure to testify into consideration in arriving at their decision. (See *People v. Dixon* (1982), 91 Ill. 2d 346, 351; *People v. Miller* (1983), 120 Ill. App. 3d 495, 503-04.) We hold, therefore, that since the State's argument was permissible there was no error.

The defendant's final allegation of error concerns the remarks of the trial court at the close of the jury instructions and during their deliberations which he alleges had the cumulative effect of coercing a compromise verdict. The trial court, after reading the formal instructions to the jury, advised them that there were two verdicts on each charge, one of guilty and one of not guilty and that they must return a verdict on each charge. The judge then proceeded to read to the jury each of the verdict forms which he prefaced with a short explanation. After excusing the alternate jurors, the court then explained to the jurors where they would be kept and how they could communicate with the outside prior to reaching a verdict. The court continued:

> "It's important that you keep in mind that the verdict must be unanimous. Everybody must agree, and I need two verdicts back. There are two charges here to think of in terms of delivery and conspiracy. I have got to have two signed verdicts back.
>
> All right. You will be confined in that room until you reach a

verdict. Nobody is to communicate with anyone out here."

The jury then retired at approximately 1:30 p.m. At 3:55 p.m., the jury interrupted their deliberation and sent a note asking the judge for his definition of reasonable doubt. An appropriate response was drafted by the trial judge, approved by the attorneys and resubmitted to the jury. Although the record does not indicate the exact time, some time later a substitute judge asked the jury: "If the court were to ask you to continue your deliberations, do you feel that there is a reasonable probability that you might yet be able to arrive at the verdicts?" The record indicates that the jurors returned to deliberate and that subsequently (again, the time notation is not in the record) they reached the verdicts.

■ Generally, it is error for a judge to interfere in jury deliberations by making remarks calculated to effect rendition of a verdict. (*People v. McVet* (1972), 7 Ill. App. 3d 381, 386.) Here, however, there was no error in the remarks made by the trial judge. The trial judge carefully explained the verdict forms, how they should be handled, and, further, he made it clear that he was not in any way indicating any opinion as to the facts of the case or as to what the jury's verdict should be. The explanation given to the jury is clearly not as strong as the language used in *People v. Preston* (1979), 76 Ill. 2d 274, 279, which was deemed not coercive. Moreover, a statement which informs the jury that it might be sequestered cannot be considered coercive. (See *People v. Baggett* (1983), 115 Ill. App. 3d 924, 930.) Nor is it error for a trial judge to inquire as to the jury's progress where it is not calculated to effect rendition of the judgment. (*People v. McVet* (1972), 7 Ill. App. 3d 381, 386.) On the facts before this court and on the basis of the law, we cannot say that the trial court's remarks had the cumulative effect of coercing a verdict.

The judgment of the trial court is affirmed.

Affirmed.

NASH, P.J., and REINHARD, J., concur.