THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICIA BERNARD, Defendant-Appellant.

Fifth District   No. 5—84—0403

Opinion filed November 18, 1986.

Randy E. Blue and Steven E. Wiltgen, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Service Commission, and Eleesha Pastor O'Neill, of counsel), for the People.

PRESIDING JUSTICE KASSERMAN delivered the opinion of the court:

The defendant, Patricia Bernard, along with Joseph Galatioto,

was charged in a two-count indictment with the offense of aggravated battery of Andrew and Vanessa Bernard, children under the age of 13 years. After a jury trial, the defendant was found guilty and sentenced to concurrent terms of seven and five years' imprisonment.

The following evidence was adduced at trial. Gary Boyer indicated that he met defendant in the first part of November 1983. At that time he lived in the U.S. 40 Motel in Fairmont City, and defendant lived with her two children, Andrew and Vanessa Bernard, and Joseph Galatioto in a neighboring unit. In about mid-November, Boyer could not pay his rent so he moved in with the defendant. Boyer stated that neither he nor the defendant ever struck Andrew or Vanessa Bernard. Beginning about the second week in November, he observed Galatioto strike Andrew Bernard in the chest with his fist while Andrew was lying on a bed. He also observed Galatioto strike Andrew with his fist on another occasion. He saw Galatioto slap Vanessa Bernard in the face and throw her into a wall. On one occasion he observed Galatioto kick Vanessa in the buttocks. Boyer testified that the defendant was present during most of these incidents. Her reaction, according to Boyer, was one of amusement. Galatioto also struck the defendant on one occasion. Boyer also testified that on one occasion defendant suggested that Vanessa be taken to a hospital but that Galatioto rejected the idea.

Although Boyer was in the company of defendant, away from the motel and Galatioto, on numerous occasions seeking employment, defendant did not ask Boyer to help her with the children. Boyer himself never did anything to stop Galatioto. Boyer testified that Galatioto, a former bouncer, was 6 feet 3 inches tall and weighed 225 pounds. Boyer testified that the defendant was not present on some occasions when Galatioto struck Andrew and Vanessa. Throughout the day defendant would be away from the motel either looking for work or working at a local bakery. Boyer admitted that he had two prior theft convictions. He left the U.S. 40 Motel on November 26, 1983, and, at the time of trial, he was incarcerated in the Madison County jail for theft.

A part-time maid at the U.S. 40 Motel, Betty Byrd, testified that during November and the early part of December she saw the defendant every day when the defendant came to pick up towels. Byrd had been instructed by the defendant and Galatioto not to clean the defendant's room. The defendant asked to borrow money from Byrd to get food for her children. In early December, the defendant asked Byrd to give her and Andrew a ride to the Rosemont Bakery, where the defendant was employed. According to Byrd, from there the

defendant planned to get a ride to the hospital.

Dr. Norma Jean Maxvold, a resident physician at Cardinal-Glennon Hospital in St. Louis, identified the defendant and testified that the defendant had brought Andrew Bernard to the hospital in early December. Dr. Maxvold testified that her examination of Andrew revealed a contused right ear, blood in both external auditory canals, a perforated left eardrum, blood in the right ear, multiple bruises to the face, a torn frenulum (the lining inside the upper lip which attaches to the gum line of the teeth), bruising behind the ears, and callous formation on several ribs, the clavicle, and the scapula. In addition, Dr. Maxvold noted bruises to Andrew's lower extremities, including unusual bruises on the dorsum of the feet, the upper surface of the feet, the ribs in the anterior chest, the abdomen and groin area, and the back and buttocks. His liver was enlarged significantly, he was suffering from serious bleeding internally, and had developed meningitis. The meningitis was traumatically induced. He was further diagnosed as having a basilar skull fracture and hearing loss in both ears, with significantly more loss in the left ear. Defendant explained Andrew's injuries to Dr. Maxvold as having occurred during falls, stating that Andrew fell quite easily and would sustain bruises. Defendant explained that she brought Andrew to the hospital because he was vomiting, and she expressed concern that because of her lack of funds, he was not receiving the proper amount of vitamins.

Jo Ann Sanders, a resident physician in pediatrics, testified that she examined Vanessa Bernard for injuries in the emergency room at Cardinal-Glennon Memorial Hospital. Vanessa's body showed multiple bruises in various stages of resolution over her body, a hymenal tear in her genital area, and a perforated eardrum. When Dr. Sanders asked Vanessa how the bruises occurred, she said that Joe had kicked her.

Dr. Armand Brodure, a pediatric radiologist, examined X rays taken of Andrew Bernard on December 5, 1983. He identified fractured seventh, eighth, and ninth ribs. The child's 10th rib had suffered a fracture near where the rib joins the spine. According to Dr. Brodure, the location of this fracture was very uncommon and occurs only as a result of a severe injury. The injury, judging from the healing, occurred weeks earlier. Dr. Brodure identified a broken scapula, or shoulder blade, and a broken collarbone. The collarbone fracture had occurred very recently, within no longer than two weeks. The fracture of the scapula had occurred at about the same time as those of the ribs, four to six weeks earlier. In addition, the child's ulna and radius of the left forearm showed healing as a result of a fracture.

The healing indicated that the injury had occurred at about the same time as that to the collarbone, *i.e.*, within two weeks. The child's right ulna showed the same healing. According to Dr. Brodure, these injuries were not consistent with falling to the floor. Based on his examination, Dr. Brodure was of the opinion that the child's physical reaction to the injury would have been immediate and vocal and would have been obvious because he would have been in great pain.

The parties stipulated that the defendant was 32 years of age, that Andrew Bernard was 23 months old and Vanessa Bernard was 5 years of age. Joseph Galatioto was 34 years of age. Following deliberations, the jury found defendant guilty of aggravated battery of Vanessa and Andrew Bernard. The court entered judgments on the verdict and set sentencing for April 19, 1984.

On April 24, 1984, a hearing was held in the circuit court of St. Clair County at which time the State moved to continue sentencing for 30 days. In support thereof, the State indicated that the State of Oregon sought the defendant's testimony in a grand jury proceeding. The court granted the motion and entered an order surrendering custody of the defendant to the custody of the Oregon authorities. Sentencing was continued until May 4, 1984.

On May 4, 1984, the People and the defense jointly filed a motion to continue the sentencing so that the defendant could give a statement to Oregon authorities regarding a criminal investigation there that concerned another of defendant's children, Victor A. R. Bernard. In return for the defendant's cooperation in giving the statement, which both the State and the defendant agreed was to be verified through a polygraph examination, the State would request an order granting defendant use immunity regarding the information in the statement and would recommend a period of probation for the defendant and six months' incarceration in the St. Clair County jail.

An order granting defendant use immunity concerning the events surrounding the current condition of Victor A. R. Bernard was entered on May 4, 1984. On May 7, 1984, the State moved to revoke the grant of immunity and to continue with the sentencing because defendant had failed to cooperate in the taking of the polygraph. The matter was continued for hearing on the State's motion to revoke the use immunity. The hearing was held on May 17 and 18. After hearing the testimony from the polygraph examiner and defendant and the arguments of counsel, the court granted the State's motion to withdraw the use immunity.

A sentencing hearing was held with defendant's assent subsequent to the hearing on the withdrawal of the use immunity. The

State argued at sentencing that defendant was not a fit candidate for probation and requested that the defendant be sentenced to terms of 14 and 7 years. The court sentenced the defendant to a term of imprisonment of seven years for the conviction of aggravated battery of Andrew Bernard and a term of five years for the battery of Vanessa Bernard, the terms to be served concurrently.

■ Defendant's first contention on appeal is that she was not proved guilty of the two counts of aggravated battery of a child beyond a reasonable doubt because the evidence did not show her striking her minor children nor did she have the intent to commit or aid in the battery of the children. Defendant argues that to sustain a conviction upon an accountability theory, the State must prove beyond a reasonable doubt that before or during the commission of the offense, and with the specific intent to promote or facilitate such commission, the defendant solicits, aids, abets, or agrees or attempts to aid the principal. (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).) The State maintains that the defendant was proved guilty of the two counts of aggravated battery of a child on the theory of accountability beyond a reasonable doubt.

At the outset we note that while mere presence at the scene of a crime or negative acquiescence in another's actions is insufficient to make a defendant accountable, one may aid and abet without actively participating in an overt act. (*People v. Ray* (1979), 80 Ill. App. 3d 151, 156, 399 N.E.2d 977, 981.) In the case at bar, the jury found the defendant legally accountable for the acts of the defendant's live-in boyfriend. A review of the evidence shows that defendant's 23-month-old son, Andrew, had bruises of various stages of healing over his entire body when he was brought to the hospital on December 5, 1983. Medical testimony revealed that these bruises were so extensive that they could not have occurred by accident. In addition, X rays showed that Andrew suffered from six fractured ribs, a broken shoulder blade, a fractured clavicle, hemorrhaging of two bones of the left forearm (the radius and ulna), periosteal hemorrhaging of the right ulna, and an abnormally enlarged right ear. Dr. Maxvold testified that her examination of Andrew revealed a contused right ear, blood in both external auditory canals, a perforated left eardrum, blood in the right ear, multiple bruises to the face, a torn frenulum, bruising behind the ears, and callous formation on several ribs, the clavicle, and the scapula. In addition, Dr. Maxvold noted bruises to Andrew's lower extremities, including unusual bruises on the dorsum of the feet, the upper surfaces of the feet, the ribs in the anterior chest, the abdomen and groin area, and the back and buttocks. His liver was enlarged signifi-

cantly, he was suffering from serious bleeding internally, and had developed meningitis which was traumatically induced. He was further diagnosed as having a basilar skull fracture and hearing loss in both ears, with significantly more loss in the left ear.

Defendant explained these injuries to the examining physician as having occurred during falls, stating that Andrew fell quite easily and would sustain bruises. She explained that she brought the child to the hospital because he was vomiting, and she expressed concern that because of her limited finances he was not receiving the proper amount of vitamins. She did not alert the hospital personnel to the fact that her 6 feet 3 inches, 225-pound boyfriend had repeatedly struck the 23-month-old baby on numerous occasions. Nor did she inform the hospital personnel upon their subsequent examination of her five-year-old daughter, Vanessa, that the multiple bruises of various ages over her body, the hymenal tear in her genital area, and her perforated eardrum were caused by the defendant's boyfriend. Rather, the defendant remained silent as to the true source of the injuries to her children. It was the five-year-old who told the doctor that defendant's live-in boyfriend had kicked her.

■ The evidence further indicated that the defendant was not ignorant of the injuries or the cause of the injuries. Gary Boyer, who lived with the defendant and her boyfriend in the defendant's motel room for approximately two weeks, testified that defendant was present during several occasions when Boyer observed defendant's boyfriend strike Andrew and kick Vanessa. Mr. Boyer further testified that the defendant's reaction to the beatings was "a look of amusement I guess you would call it." Even though she was present while her baby and five-year-old were beaten with fists and feet, defendant did not intervene and only once did she suggest to her boyfriend that they should "take the kid to the doctor." The defendant did not ask Mr. Boyer to aid her in protecting her children, in spite of the fact that she was alone with him on a number of occasions. Defendant's assistance in the batteries inflicted on her children can therefore be inferred from her failure to oppose them. (Cf. People v. Crutcher (1979), 72 Ill. App. 3d 239, 244, 390 N.E.2d 571, 575.) Defendant's employer, whom she saw daily, the owner of the motel where the defendant lived, and the motel maid, who saw defendant everyday, all testified that defendant never confided that her children were being beaten by her boyfriend or asked for help to prevent the continued injury to the children. If the evidence establishes that the defendant was present at the commission of the battery to the minor children without disapproving or opposing it, the trier of fact may properly

consider this conduct in connection with other circumstances and reach the conclusion that the defendant assented to the commission of the crime, lent to it her countenance and approval, and was thereby aiding and abetting it. (*People v. Cole* (1977), 50 Ill. App. 3d 133, 142, 365 N.E.2d 133, 140.) These factors, along with the failure to report the incidents or confide in anyone about them and her close association with the perpetrator of the abuse, were properly considered by the jury in establishing her accountability. *People v. Ray* (1979), 80 Ill. App. 3d 151, 156, 399 N.E.2d 977, 981; *People v. Watson* (1982), 106 Ill. App. 3d 315, 317, 436 N.E.2d 7, 8.

■ Defendant contends that the fact that she took Andrew to the hospital mitigates against her involvement in the abuse of her children. Defendant's own explanation to the examining physician at the hospital belies this contention. The defendant's concern was that her son was vomiting and might have a vitamin deficiency. She did not intervene in the repeated beatings of either Andrew or Vanessa, at which she was present. Further, she continued to leave her children with her boyfriend for long periods of the day despite her knowledge of the abuse he was inflicting on them. Additionally, the medical evidence showed that defendant could not have been unaware of the pain Andrew had been suffering in the weeks prior to the time she took him to the hospital. As Dr. Brodure noted in his testimony, the broken collarbone appeared to be two weeks old, the same age as the broken bones in both of the child's arms. He indicated that Andrew's reaction to these injuries would have been immediate, vocal, and obvious, and he would have refrained from using the broken limb. In addition, Andrew was suffering from older injuries—the broken ribs and broken scapula—which were estimated to be four to six weeks old. Again Dr. Brodure testified that the child would have been in great pain and the injuries would have been obvious. Despite the fact that the pain and the loss of use of his limb would have been obvious to defendant for weeks, she did not bring the child to the hospital until he began vomiting. Defendant sought medical treatment for what she thought was an illness, neglecting any report of the beatings which she had witnessed.

■ Defendant's contention that her conviction must be vacated because there was no proof of a common design with the perpetrator of the batteries is contradicted by her own actions. Proof of a common design need not be supported by words or agreement but can be drawn from the circumstances surrounding the commission of the act, and proof that the defendant was present at the commission of a crime without disapproving or opposing it may be considered with

other circumstances. (*People v. Hunter* (1979), 69 Ill. App. 3d 732, 734, 387 N.E.2d 1018, 1020.) The jury in the case at bar was not required to search out various potential explanations compatible with innocence and raise them to the status of a reasonable doubt. The jury's determination that the defendant is legally accountable for the criminal act of another will not be set aside unless the evidence is so improbable, unsatisfactory, or unreasonable as to warrant a reasonable doubt of the accused's guilt. (*People v. Grice* (1980), 87 Ill. App. 3d 718, 726, 410 N.E.2d 209, 216, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714.) Defendant's conduct, including her continued association with her boyfriend, her failure to report to authorities any of the incidents of abuse of her children, and her failure to attempt to prevent or oppose the abuse is not consistent with that of an innocent person similarly situated and is sufficient to support an inference that a common understanding or design to abuse the children over a long period of time existed. (*People v. Ray* (1979), 80 Ill. App. 3d 151, 157, 399 N.E.2d 977, 981.) We accordingly find that the jury's finding of guilt was not so improbable, unsatisfactory, or unreasonable as to warrant reversal of defendant's conviction.

■ Defendant next contends that the trial court committed reversible error in giving the jury Illinois Pattern Jury Instruction, Criminal, No. 4.14 (2d ed. 1981) (hereinafter IPI Criminal 2d), which provides:

> "A material element of every crime is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing."

Defendant contends that this instruction confused the jury because it did not include a definition of the phrase "duty which the law imposes." Without a definition of the "duty which the law imposes" upon the defendant, defendant argues that the jury was given no guidance as to what omissions constituted an act. Defendant contends that the jury was able to arrive at its own concept of "duty" and thereafter find a violation of it. In support of her position, defendant relies on *People v. Weeks* (1983), 115 Ill. App. 3d 524, 450 N.E.2d 1351. However, rather than reversing defendant's conviction because of that portion of IPI Criminal 2d No. 4.14 relating to the "duty which the law imposes," the court in *Weeks* implicitly approved the language, stating that while neither the State nor the defendant discussed the nature and extent of the duty the law imposes, it assumed a legal duty did exist. It was not the duty aspect of the instruction which the court found to be erroneous. Rather, the court held that the

State in *Weeks* was required to establish beyond a reasonable doubt that the defendant, who was weak with loss of blood and who lost consciousness before her newborn child died, was capable of performing the duty the law imposed on the mother to protect her child. 115 Ill. App. 3d 524, 528, 450 N.E.2d 1351, 1354.

Unlike the defendant in *Weeks*, the defendant in the case at bar had numerous opportunities to seek assistance for her abused children but never did. A number of witnesses who saw the defendant on a daily basis or regularly outside the presence of her boyfriend testified that the defendant never requested aid in protecting her children from further abuse, nor did she report the abuse to them. She did not report the abuse to the authorities or intervene or seek to prevent further injury to her children but rather stood by with a "look of amusement" while the children were struck, kicked, and thrown against the wall of their motel room at various times. These events occurred during the period of two weeks witnessed by Gary Boyer. Defendant does not contend that she was under no duty to act. In fact, defendant acknowledges that the caretaker or parent of a child has a duty to protect the child from harm, citing *People v. Watson* (1982), 103 Ill. App. 3d 992, 998, 431 N.E.2d 1350, 1355. Instead, defendant argues that the absence of an instruction containing a clarifying definition of duty permitted the jury to declare its own standard of criminal liability. Defendant, however, did not offer such an instruction to the court. Having failed to offer the instruction she now complains of, defendant has waived this objection (*People v. Lee* (1980), 84 Ill. App. 3d 441, 445, 405 N.E.2d 860, 863), and the trial court is not under any duty to give an additional instruction on its own motion (*People v. Koch* (1978), 64 Ill. App. 3d 537, 546, 381 N.E.2d 377, 383).

■ We note that the jury was instructed as to the legal responsibility or duty of the defendant with the accountability instruction, which provided:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, she knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." (IPI Criminal 2d No. 5.03.)

Inasmuch as defendant was charged under the theory of accountability, the omission to perform the duty to protect her children from harm was an integral element of the offense with which she was charged. As we have indicated earlier, defendant was properly found to have aided and abetted in the battery of her two children. Thus

even if further clarification of the duty of the defendant was needed, as defendant contends, given the violation of her duty to protect the children from harm, we find that any failure to give the definitional instruction which defendant contends was needed was not a substantial defect. (*Cf. People v. Lee* (1980), 84 Ill. App. 3d 441, 445, 405 N.E.2d 860, 863.) As a reviewing court, we will assume that the jury followed the instructions given. *People v. Platter* (1980), 89 Ill. App. 3d 803, 820, 412 N.E.2d 181, 194.

■ Defendant's third contention on appeal is that she was denied a fair trial when the trial court allowed Dr. James Monteleone, a pediatrician in charge of the child-abuse clinic at Cardinal-Glennon Hospital in St. Louis, to testify regarding his diagnosis that defendant's children had suffered child abuse.

Dr. Monteleone testified that he was a pediatrician and head of the child-abuse unit at Cardinal-Glennon Hospital in St. Louis and had been involved in the child-abuse unit since 1962. He gave a general explanation of the term "child abuse" as used in his medical speciality. This general definition included Dr. Monteleone's opinion that "another aspect is failure to protect" and that a parent who fails to protect a child "[is] as guilty of abuse as a person who actually physically strikes them." Defendant objects to the inclusion of this part of the doctor's explanation of the term "child abuse" as: (1) an infringement on the jury's role in determining defendant's guilt on the battery charges, (2) a prohibited statement of the cause of the injuries, and (3) a misstatement of law. From our review of the record, we find that at no time did Dr. Monteleone connect this part of his general definition of the term "child abuse" with the defendant in order to give an opinion regarding the charges on which defendant was being tried.

Dr. Monteleone testified further that child abuse does not always involve physical abuse but entails "emotional and nutritional abuse" or "maternal abuse." In explaining his diagnosis of child abuse of the defendant's son, Andrew, Dr. Monteleone noted that in addition to his injuries, Andrew suffered the classic appearance that goes with maternal and emotional abuse—the lost look, the wanton look, the blank stare. The defendant contends this testimony was prejudicial and erroneously admitted because it was tantamount to expert testimony on the ultimate issue of the defendant's culpability. Defendant contends that the doctor's diagnosis stated that the defendant was the cause of the injuries. However, the record indicates that after noting that Andrew suffered the classical appearance that goes with maternal and emotional abuse, Dr. Monteleone then described the physical injuries his examination revealed which led to his diagnosis of the injuries be-

ing caused by child abuse. After telling of the extensive bruising over Andrew's body, the multiple fractures in various stages of healing, the injury to his spleen and liver, and the blood and spinal fluid coming from the child's ear, the doctor stated:

"He had bruises in every area of his body. Just impossible to happen by accident, had to be child abuse inflicted by a person."

Dr. Monteleone then testified that defendant's other child, five-year-old Vanessa, also suffered from child abuse. This opinion was based on the fact that her injuries were "in atypical areas, genital area, on her inner calves, on her buttocks and on her side, just accidental injuries do not happen like that in children." While confirming that the injuries of the children could have resulted only from child abuse, the doctor did not testify, as defendant contends, that defendant caused the injuries. In fact, he emphatically stated, "Oh, no, I can't tell who administered them, but I can tell you that they were, you know, oh, no, I can't tell you who administered."

■ As the courts in Illinois have held, there is no reason to prohibit a qualified physician from giving an expert opinion that a child suffered from child abuse. (*People v. Platter* (1980), 89 Ill. App. 3d 803, 819, 412 N.E.2d 181, 193.) Admission of such testimony is permissible as long as the trial court is satisfied that the witness was qualified to give an opinion on the subject. (*People v. Ward* (1983), 112 Ill. App. 3d 547, 556, 445 N.E.2d 883, 890, *rev'd on other grounds* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.) Since the doctor's diagnosis in the case at bar did not state that the defendant battered the children, there was no inconsistency with defendant's defense that the injuries were caused by another person. (*People v. De Jesus* (1979), 71 Ill. App. 3d 235, 237, 389 N.E.2d 260, 261.) Accordingly, we find that the doctor's expert opinion was properly allowed by the trial court.

■ Defendant's final contention on appeal is that she is entitled to a reduction of her sentence or a new sentencing hearing because the court heard improper evidence regarding her sentencing. In particular, defendant contends that the court heard evidence of a polygraph test in connection with her application for probation.

On May 4, 1984, the date originally set for the sentencing of the defendant, the State and the defense jointly filed a motion to continue the sentencing so that defendant could give a statement to Oregon authorities regarding a criminal investigation there concerning another of defendant's children, Victor A. R. Bernard. In return for the defendant's cooperation in giving the statement, which both the State and defendant agreed was to be verified through a polygraph exami-

nation, the State would request an order granting defendant use immunity regarding the information in the statement and would recommend a period of probation for the defendant and six months' incarceration in the St. Clair County jail. An order granting defendant use immunity concerning the events surrounding the current condition of Victor Alfred Bernard was entered on May 4, 1984. The order provided:

"This immunity is conditioned on the defendant providing a statement to law enforcement officials as to her knowledge of the condition of Victor A. R. Benard [sic] prior to Victor A. R. Benard [sic] leaving Oregon and that she pass a polygraph indicating her truthfullness [sic] to that statement. Further condition is that defendant agrees to cooperate with all law enforcement agencies concerning the prosecution of any criminal offense arising out of said statement."

No order regarding the sentence of defendant was entered at that time nor did the court indicate that it would accept the State's recommendation of the proposed sentence of defendant.

On May 7, 1984, the State moved to revoke the grant of immunity and to continue with the sentencing because defendant had failed to cooperate in the taking of the polygraph. The matter was continued for hearing on the State's motion to revoke the use immunity. The hearing was held on May 17 and 18. Robert Baldwin testified at the hearing that he was a polygraph examiner for the Belleville police department. He testified that the defendant was a good subject for examination, the apparatus was applied, and that the defendant answered three questions in the negative. Baldwin testified, however, that the defendant did not complete the test because she did not submit to a second "chart." In regard to the results, Baldwin contended that there was no pattern of deception to the first question but that there was a "pattern of deceptive tracing" on the second and third questions. The defendant testified that she answered the questions while the apparatus was applied. Baldwin then stated that an additional test would be required, and since defendant believed that she completed the test, defendant declined and asked to speak to her lawyer. The State thereupon argued that the evidence revealed that the defendant had not completed the test and that the defendant lied on two of the three questions. It urged that immunity should be withdrawn, and that the court should continue with sentencing. Defense counsel argued that the defendant had complied with the agreement and, although there were no plea negotiations *per se*, the "interweaving of this Oregon investigation" had been at the State's insistence.

Defense counsel urged that the State should comply with its sentencing recommendation. The court set aside its order granting immunity, concluding that the defendant did not pass a polygraph indicating her truthfulness. With defendant's assent, the court then proceeded with the sentencing hearing. The sentencing hearing consisted of argument on aggravation and mitigation, a statement by the defendant, and an examination of defendant's presentence investigation report.

Our review of the record reveals that the issue surrounding defendant's breach of her agreement with the State's Attorney to take the polygraph was limited to the State's motion to withdraw the use immunity conditionally granted to the defendant. It did not involve the sentencing hearing, which was held separately and subsequent to the hearing on the motion and was not part of the sentencing considerations relied upon by the trial court. In reviewing the record, we find that the events surrounding the polygraph itself were not argued or considered at the sentencing hearing. The trial court noted that based upon its independent assessment of the factors in aggravation and mitigation, the statements relative to sentencing, and defendant's own statement, it determined that probation should be denied given the nature and circumstances of the offense and the history, character, and condition of the offender. The court found that imprisonment of the defendant was necessary for the protection of the public and that probation would deprecate the seriousness of defendant's conduct. In aggravation, the court found that, in committing the felony, the defendant inflicted, by accountability, serious bodily injury to another and that defendant had a history of prior delinquency and criminal activity. The court found that a sentence was necessary to deter others from committing the same crime and that the defendant committed a heinous crime for which an extended term of imprisonment could be imposed. The court additionally found no factors in mitigation. Defendant was then sentenced to a term of imprisonment of seven years on the conviction of aggravated battery of Andrew Bernard and a term of five years for the battery of Vanessa Bernard, the terms to be served concurrently.

■■■ From our review of the record, we find that the court's sentences were not an abuse of discretion and that it was not an abuse of the court's discretion to determine that the defendant should be sentenced to more than the minimum sentence provided. (*People v. La Pointe* (1982), 88 Ill. 2d 482, 431 N.E.2d 344.) We find that the record shows that the trial court properly considered factors in both aggravation and mitigation, giving its reasons for the sentences imposed. We cannot substitute our judgment for that of the trial court merely

because we would have imposed a different sentence because it is not the function of a reviewing court to reweigh the evidence and substitute its judgment for that of the trial judge. (*People v. Hefley* (1982), 109 Ill. App. 3d 74, 78, 440 N.E.2d 173, 177.) Accordingly, we find that defendant's sentences should be affirmed.

For the foregoing reasons, we affirm defendant's convictions and sentences.

Affirmed.

KARNS and WELCH, JJ., concur.