THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BARBARA PETERS, Defendant-Appellant.

First District (4th Division)   No. 1—90—1561

Opinion filed December 26, 1991.

Walsh, Neville, Pappas & Mahoney, of Chicago (Matthew P. Walsh and J. Mark Lukanich, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Maureen A. Harton, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a bench trial, the defendant, Barbara Peters, was found guilty of murder, aggravated battery of a child, cruelty to a child, and endangering the life of a child under a theory of accountability. Judgment was entered on the three murder counts, the court finding that all of the other counts merged into the murder counts. The defendant was sentenced to a 30-year term of imprisonment.

In her appeal, the defendant contends that she was not proved guilty of murder beyond a reasonable doubt because the State failed to prove that she could be held accountable for her son's murder when she was not present at the time he was murdered by her boyfriend and did not perform any act specifically intending to facilitate his murder. Additionally, the defendant contends that even if the defendant can be deemed criminally liable for the death of her son, the defendant's conduct amounted to a conscious disregard of an unjustifiable risk and her conviction should be reduced to involuntary manslaughter. The defendant also contends that the trial court erred in allowing the medical examiner to state opinions at trial that were beyond her expertise and without factual basis.

At 6:42 a.m. on December 17, 1987, 20-month-old Bobby Peters was brought to the emergency room at LaGrange Memorial Hospital by the defendant, his mother, and the codefendant, Kenneth Jacobsen, who had been the defendant's boyfriend for six months. The emergency room staff was unsuccessful in its attempts to resuscitate Bobby, and he was pronounced dead at 6:47 a.m. The autopsy report stated that Bobby Peters died as a result of bilateral subdural hematomas which resulted from blunt head trauma.

The defendant and Jacobsen were charged in a 19-count indictment with the offenses of first degree murder, aggravated battery to a child, cruelty to a child, and endangering the life or health of a child. Their cases were severed prior to trial.

At trial, Bobby's former baby-sitter, Karen Wagner, testified for the State. Wagner met the defendant in January 1987 at the bowling alley in Countryside, where they were both employed as waitresses. They became friends, and in April 1987, Wagner began baby-sitting four or five times a week for Bobby, who was then a year old.

The first time that Wagner noticed anything peculiar regarding Bobby's physical condition was in early July 1987. The defendant had begun dating Kenneth Jacobsen the previous month. Wagner testified that Bobby had a diaper rash that was "red, raw, dry and it was cracking." She telephoned the defendant's father to obtain the name of their pediatrician, who prescribed an ointment.

Toward the end of July 1987, Wagner was again baby-sitting and while changing Bobby's diaper, noticed a bruise that covered his entire buttocks. Wagner testified that she questioned the defendant about the bruise, and the defendant said she thought Bobby had fallen at Wagner's home. Bobby was learning how to walk at the time, but Wagner testified that Bobby had never bruised himself to that extent any time he had fallen in her home.

In early August 1987, when Bobby came to Wagner's home, he had small bruises on his cheeks, on his chin, and on his forehead. Wagner testified that Jacobsen told her that Bobby had fallen off the ladder of a slide. Wagner, however, did not observe any dirt or blood on Bobby's clothes at the time. The defendant asked Wagner about the bruises and Wagner told her what Jacobsen had said. The defendant did not respond.

Later in August 1987, Jacobsen brought Bobby over to Wagner's home and Bobby had four or five "bumpy-like welts" scattered around the center of his back. Jacobsen told Wagner that Bobby had fallen down an elevator shaft.

In the beginning of September 1987, Bobby came to Wagner's home with a split on the inside and outside of his lower lip. The defendant told Wagner that Bobby had fallen on the sidewalk.

By this time, Jacobsen and the defendant were living together and Wagner baby-sat on weekends and Jacobsen watched Bobby during the week. Wagner stated that in October 1987, she invited Bobby to her home for her husband's and son's birthday party. The defendant brought Bobby to Wagner's home dressed in his pajamas. When Wagner later changed Bobby's diaper, she observed that the pajama was stuck to the back of his leg. Upon removing the pajama, Wagner testified that she saw an oval-shaped burn which measured about two to three inches in diameter running across Bobby's calf. Wagner stated that the skin on Bobby's leg was "raw and pussy." Since the defendant had not mentioned anything about the burn, Wagner telephoned the defendant at work and asked her how Bobby received the burn. Wagner stated the defendant told her the burn was caused from Bobby's clothes rubbing on the back of his leg. Wagner testified that during the time that Bobby had been in her care and worn slacks, she had never noticed a similar injury.

One week before Halloween, Wagner had a telephone conversation with the defendant in which the defendant told her that Jacobsen had taken Bobby to the hospital because he had incurred another burn. The defendant told Wagner that Jacobsen had tripped over Bobby and spilled hot tea on the back of Bobby's head and neck. Wagner testified that the defendant told her they were going to arrest Jacobsen for child abuse and the hospital was going to press charges against him.

The following day Wagner saw Bobby and described him as "walking stiff." Wagner stated that Bobby could not move his head from side to side. When Wagner removed his shirt, she observed that the burn went "from the top of his scalp down his neck and one shoulder," and "was very raw, very pussy, [and] his undershirt was stuck to it."

On October 31, 1987, Wagner contacted the Department of Children and Family Services (DCFS) hotline and told them of Bobby's bruises and burns. She told DCFS that in her opinion, Bobby was being abused.

The following day, the defendant telephoned Wagner and told her that DCFS had contacted her and that an appointment had been scheduled for the following day. Wagner denied having contacted DCFS. The next day, Wagner testified, she telephoned the defendant to inquire about what happened at the appointment with

DCFS. Wagner stated the defendant hung up on her. The defendant subsequently refused to speak to Wagner and never asked Wagner to baby-sit for Bobby again.

Wagner did not see Bobby until the end of November 1987. Wagner ran into the defendant at the bowling alley, and the defendant allowed Wagner to take Bobby to Wagner's home for several hours. Wagner testified that during her visit with Bobby, she did not notice any other fresh injuries on Bobby and stated that the burn was healing.

The last time that Wagner saw Bobby was on December 8, 1987, at the bowling alley. Wagner asked the defendant's permission to see Bobby for Christmas and the defendant refused. The defendant told Wagner that Jacobsen did not want either the defendant or Bobby to have anything to do with Wagner.

On cross-examination, Wagner testified that the defendant told her that she did not want Bobby and that Bobby was a burden. Wagner believed that Bobby loved his mother but that the defendant did not love Bobby "the way a mother should love a child." Wagner observed that when Jacobsen came to pick up Bobby from her home, Bobby would grab Wagner or her husband and start crying.

Bernadine Peters, Bobby's paternal grandmother, testified for the State. The first time Peters ever saw her grandson was August 1987. Her next visit with Bobby was in early September 1987. Peters testified that on both of these occasions, she did not notice any bruises on Bobby when she changed his diapers.

Peters testified that later in September 1987, Bobby was at her home because Dale Peters, her son and Bobby's father, was baby-sitting. Peters testified that when she was changing Bobby's diapers, he was "very stiff and frightened." At this time, she observed black and blue marks on Bobby's chest, ankles, and buttocks. Peters stated that there were many bruises "about the size of a finger. And the butt was just almost completely covered *** [w]ith black and blue marks." Peters stated that in her opinion, Bobby was not an easy bruiser.

Peters saw Bobby again toward the end of November 1987 and testified that she did not remember seeing any bruises at that time.

Dr. Nancy Jones, the forensic pathologist who performed the autopsy, testified to the contents of Bobby's pediatric records. Dr. Jones stated that according to the growth chart in Bobby's records and the pediatrician's own private notes, Bobby was growing and developing normally until June 1987, when he was about 15 months

old. Dr. Jones stated the records showed that at 15 months, Bobby had a "sudden, rather precipitous drop off [in] his weight and his length." Dr. Jones testified that at 15 months Bobby weighed 21 pounds, whereas at the time of autopsy Bobby was 20 months old and weighed 19 pounds.

Dr. Jones stated that the pediatrician's records also showed that Bobby had developed a heart murmur at approximately the same time that the weight loss began. Dr. Jones testified there was no evidence of any heart defect on autopsy to explain the heart murmur.

On December 18, 1987, Dr. Jones performed the autopsy on Bobby's body. Dr. Jones testified that since July 1986, she had conducted 1,500 autopsies and over 200 of them had been performed on children under the age of two.

Dr. Jones testified that Bobby died as a result of bilateral, subdural hematoma which resulted from blunt head trauma. Dr. Jones stated that based upon the autopsy, the constellation of injuries, the varying ages of the injuries, and Bobby's pediatrician's records, Bobby's physical condition at the time of autopsy was "the direct result of on-going abuse." Dr. Jones further testified that Bobby had been battered enough to produce bruises that were at least a week old, and maybe more. It was Dr. Jones' opinion that the abuse dated back to, approximately, June 1987, when Bobby was 15 months of age. Dr. Jones indicated on Bobby's death certificate that the injuries were intentional and not the result of accidental acts.

Dr. Jones stated that her exterior examination revealed that Bobby was underdeveloped for his age, significantly shorter and underweight. Dr. Jones described the exterior of Bobby's body as having a large number of bruises which were distributed over his head, trunk, and upper and lower extremities.

Dr. Jones explained that bruises go through various color changes during the one- to two-week healing period. From the coloration of a bruise, one can evaluate the age of the bruise and the approximate time that has elapsed since the injury which resulted in the bruise.

Dr. Jones described bruises with varying colorations on Bobby's body, extending all along the right and left side of his face, both of his arms, both of his hands, his chest, the tops of his feet, on his back, and on his buttocks. Dr. Jones further explained that on autopsy, the physician can determine the depth of the bruises by observing how far the bruise extends into the subcutaneous fat under the surface of the skin. The deeper the bruise goes into the subcu-

taneous fat, the greater the force which was used to cause the injury.

Her internal examination revealed a large area of hemorrhage, containing 16 grams of clotted blood, under the surface of Bobby's scalp on both the right and left side of Bobby's head. Dr. Jones testified that Bobby's brain was very swollen and explained that this is the way the brain reacts to injury. Dr. Jones' internal examination of Bobby's body also showed two inches of hemorrhaging in the abdominal cavity area and two additional hemorrhages in the tongue which were consistent with bite marks. In total, Dr. Jones' internal examination revealed 45 different areas of bruising on Bobby's body.

Dr. Jones stated that based on the color of the bruises, the bruises on the right and left side of Bobby's face and the bruises on the back of his hands would have definitely been visible on December 16, the day before Bobby died. There was nothing in Bobby's records to indicate that he had any underlying illnesses or bleeding problems which would substantiate that Bobby was an "easy bruiser." Dr. Jones testified the bruising on Bobby's left forearm, the back of his right forearm, on his buttocks, and on his right and left feet went down into his subcutaneous tissue.

Investigator Baldwin, a detective with the Cook County sheriff's police, testified for the State regarding the conversation he had with the defendant following Bobby's death. Baldwin stated the defendant told him that the last time she saw Bobby alive was on December 16, 1987. The defendant left her home at 6:30 p.m. to go drinking with one of her girl friends. The defendant returned home three hours later. Jacobsen had put Bobby to bed and the defendant did not look in on him that night. When the defendant awoke on December 17, Jacobsen told her that they had to take Bobby to the hospital because Bobby had turned blue.

The defendant told Baldwin that she had been living with Jacobsen since September 1987. The defendant explained that when she worked, she would routinely leave Bobby in the custody of Jacobsen. The defendant told the investigator that when she came home from work and saw all of Bobby's bruises and the injuries to his body, she accepted Jacobsen's explanation that Bobby was just clumsy and was prone to falling down and inflicting injury on himself. The defendant told Baldwin she never thought Bobby's injuries were very serious and she did not feel that the injuries warranted taking Bobby to the hospital. The defendant explained that she did not take Bobby to the hospital for his burns because Jacobsen had

told her that he had gone to LaGrange Memorial Hospital and had obtained a jar of salve. Baldwin testified that he personally checked into Bobby's purported visit to LaGrange Hospital and discovered that Bobby had, in fact, never been taken there for his burn.

Baldwin stated that when he told the defendant the medical examiner had determined that Bobby's death was the result of a homicide, the defendant just shrugged her shoulders and gave him a look as if it did not matter. The defendant told Baldwin that she had not really wanted the boy. When Baldwin asked her whether she did not really care what happened to Bobby, the defendant responded, "I guess not." When Baldwin asked her how she thought Bobby died, the defendant responded that she thought Jacobsen was responsible for his death.

In contrast, the defendant also told Baldwin she loved Bobby and that she would never allow someone to abuse the boy or to deliberately hurt him.

Linda Norcutt, the outpatient registrar at LaGrange Memorial Hospital, was working in the emergency room on the morning of December 17, 1987. Norcutt testified that at 6:42 a.m., the defendant and Jacobsen brought Bobby into the emergency room. Norcutt testified that at that time, she overheard the defendant say to Kenneth Jacobsen, "I told you not to get so angry, I told you not to get so angry, I told [you] this would happen." Norcutt stated that Jacobsen responded, "Shush, shush, and to go sit down."

Susan Siorek, a registered nurse at LaGrange Memorial Hospital, testified that at 6:42 a.m., a gentleman came in with a child that was not breathing. Siorek described Bobby as "very pale, very cold, very thin, and emaciated, unkept and he also was covered with bruises." Siorek testified that the bruises were in various stages of healing and ranged in color from yellowish-green to red-purplish.

Photographs of Bobby's body were admitted into evidence, and Siorek described the bruises which were present. Beginning with Bobby's face, Siorek testified that her examination revealed massive bruising around the face as well as swelling to the forehead. The photographs showed bruising all along the left side of Bobby's eye and cheekbone, at the temple, and extensive bruising along the jawline. Other photographs illustrated bruises along the front of Bobby's forehead, along Bobby's right and left eyebrows, and along the bridge of his nose. Photographs of the front side of Bobby's body showed bruising in the chest area. Photos of Bobby's left arm showed extensive bruising all along the fingers of the left hand, as

well as bruising to the wrist, and up into the left arm and elbow. Photos of Bobby's right arm revealed bruises along all of the fingers of the right hand extending up to the top of the hand, as well as bruises along the top of the right arm.

Other photographs illustrated bruising all along the top of both of Bobby's feet and what Siorek described as "[f]airly new bruising" all along the top of the toes on both feet.

Finally, other photos displayed bruising to the left shoulder and down along the spinal column. Various other bruises were present along Bobby's back and on his buttocks.

The testimony of Dr. Carol Haller, an associate pathologist at Illinois Masonic Hospital and consultant for the Cook County medical examiner's office, was stipulated to by the State and the defense. Dr. Haller would have testified that she had studied over 300 head injuries in children under the age of two. After having examined Bobby's brain and its coverings, Dr. Haller opined that in order to cause the head injury which Bobby sustained, "It would take a force that would be something like that received in a motor vehicle accident. Or it would take force from a considerable height, let's say three stories or above."

Dr. Haller believed that to sustain the type of head injury which Bobby presented, his head would have to have been forcibly smashed against a table top, countertop, or wall. If Bobby's head injury was caused by an object coming into contact with his head, it would have been something like a baseball bat, a heavy stick, or a club. In her opinion, the injury was not consistent with Kenneth Jacobsen's explanation that Bobby had fallen down the stairs onto the sidewalk.

Finally, the 31-year-old defendant, Barbara Peters, testified that Bobby was not a planned child. She financially supported both Bobby and Jacobsen and worked from 5 p.m. to midnight during the week and bartended on weekends. During the time she was working, Jacobsen watched Bobby. The defendant stated that she trusted Jacobsen with Bobby and felt Bobby was safe with him. The defendant had seen Jacobsen use cocaine once or twice around December of 1987.

The defendant testified she never saw Jacobsen abuse Bobby and she never willfully caused or permitted Jacobsen to abuse Bobby. Peters stated she never saw Jacobsen hit or strike Bobby. Jacobsen never struck her. She never saw Jacobsen get angry with Bobby. She never saw Jacobsen reprimand Bobby.

The defendant stated she knew about the burn on Bobby's back. However, the defendant explained that Jacobsen told her he had spilled tea on Bobby's back and he had taken Bobby to the emergency room. The defendant stated she did not come home from work when she learned of Bobby's burn, but when she later came home, Bobby was asleep. The defendant did not see the burn until the following day.

The defendant testified that, on occasion, she saw bruises on Bobby. However, the defendant stated that Bobby was small for his age and clumsy. In her words, "[Bobby] didn't walk too good. He would fall down a lot." The defendant stated that since Bobby bruised easily, she was not alarmed when she saw bruises. She was never suspicious of any injuries that Bobby sustained. Every time she noticed a bruise, Jacobsen would tell her that Bobby had fallen.

The defendant testified that in November of 1987, she saw Jacobsen throw a chunk of ice at Bobby that hit him in the head. The defendant told Jacobsen to be careful because Bobby would get whiplash.

The defendant stated that the last time she saw Bobby alive was on December 16, 1987. She testified that she was with Bobby all day but she never changed his diapers or pajamas. She stated that she had not given Bobby a bath or changed his diapers for three weeks before Bobby died. The defendant only saw Bobby fully dressed.

The defendant stated that when they discovered on December 17, 1987, that Bobby was blue, neither she nor Jacobsen called an ambulance. Rather, the defendant and Jacobsen drove Bobby to LaGrange Memorial Hospital.

On cross-examination, the defendant admitted that she did see Bobby's face during the three-week period, but said that Bobby always had a bruise on his face. When she was shown a photograph of Bobby's bruised face, the defendant stated that on December 16 she did not see "that many" bruises on Bobby's face, and the bruises were "[n]ot that big."

The defendant also admitted that she had seen the bruises on Bobby's hand that were depicted in the photograph. However, the defendant stated that Jacobsen told her that Bobby was playing in his room, and the crib fell on his fingers.

The defendant was questioned about her knowledge of Bobby's weight loss. The defendant testified that on July 20, 1987, and on August 11, 1987, the pediatrician told her that Bobby's growth parameters were declining. The defendant stated that she canceled

Bobby's follow-up appointments with the pediatrician. The defendant testified she canceled Bobby's November 10, 1987, follow-up appointment because she was feeling sick. She canceled her November 24, 1987, appointment because her car would not start. The defendant testified that August 11, 1987, was the last time she took Bobby to the pediatrician.

The defendant admitted that she told Detective Baldwin she believed Jacobsen was responsible for Bobby's death, and that she may have been negligent at times in leaving Bobby with Jacobsen.

The defendant was found guilty of murder by reason of accountability. The accountability statute provides:

> "A person is legally accountable for the conduct of another when:
>
> * * *
>
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).

■■ Generally, a person will not face criminal liability for failing to aid another. However, the common law has carved out an exception in the case of a parent-child relationship. Custodial parents have an affirmative duty to protect and provide for their minor children. (*People ex rel. O'Connell v. Turner* (1870), 55 Ill. 280; *People v. Bernard* (1986), 149 Ill. App. 3d 684, 500 N.E.2d 1074; W. LaFave & A. Scott, Substantive Criminal Law §3.3 (1986).) A parent who knowingly fails to protect his or her child from abuse may be prosecuted under the accountability statute and, thereby, becomes legally accountable for the conduct of the abuser.

The accountability statute mandates that the person charged must have the intent to promote or facilitate the offense. Intent may be gleaned from knowledge. A person who knows that his or her child is in a dangerous situation and fails to take action to protect the child presumably intends the consequences of the inaction. In the context of the instant case, the defendant intended to facilitate the offense.

■■ The evidence supports the trial court's finding that, beyond a reasonable doubt, the defendant intended to facilitate the offense because she knew that Jacobsen was abusing her son. Upon becoming aware of the abuse to Bobby, the defendant, as his mother, had a duty to protect her son from further abuse. By knowingly failing to remove Bobby from an abusive and dangerous environment, the

defendant, aware of the consequences of her inaction, facilitated further harm to Bobby. The defendant aided Jacobsen, who continued to abuse and, ultimately, murder her son by failing to protect him during the many occasions when it was reasonably possible for her to do so.

The evidence in the record which supports the defendant's knowledge of the abuse to her son is ample. During the five-month period of time in which the defendant was either dating or living with Jacobsen, Karen Wagner discussed six different injuries to Bobby with the defendant. These injuries ranged from bruises to welts and extensive burns. The explanations which Jacobsen or the defendant gave Wagner for the cause of the injuries were often inconsistent with the type of injury sustained. Wagner ultimately contacted DCFS. The defendant's response was to fire Wagner.

Also during the time the defendant was dating Jacobsen, she was told by Bobby's pediatrician that Bobby was losing weight, had stopped growing, and had developed a heart murmur. The defendant's response was to cancel three subsequently scheduled appointments with the pediatrician and to never take Bobby back to the doctor.

The medical findings revealed that Bobby died from a blunt head trauma and that the force required to cause the injury to Bobby's brain would have been similar to the impact of an automobile accident or falling from a height of at least three stories.

The medical testimony described that Bobby's physical condition at the time of the autopsy was the result of intentional, on-going abuse. Bobby's body was covered with 45 areas of bruising, and many of the bruises were at least a week old. At a minimum, the extensive bruises on Bobby's face and hands were visible when the defendant saw Bobby the day before he was murdered.

The defendant's statement to Jacobsen at the emergency room further illustrated her awareness of previous abuse and her knowledge of the dangerous environment in which she allowed her child to remain. In spite of her repeated assertions that she lacked knowledge of the abuse, the defendant told the investigator that she believed Jacobsen was responsible for Bobby's death.

The evidence also demonstrates that during the time of her relationship with Jacobsen, the defendant took no action to protect her son despite numerous opportunities to do so. The defendant did not seek medical help for Bobby, she did not contact the authorities, and she did not remove Bobby from Jacobsen's care. To the contrary, the defendant corroborated Jacobsen's explanations for the

injuries to Wagner, ignored visible bruises on Bobby's body, and continued to turn over the complete care of Bobby to Jacobsen.

For all of the above reasons, we believe that the evidence supports the trial court's finding that, beyond a reasonable doubt, the defendant knew of the on-going abuse to her son and failed to take any action to protect him. The evidence also supports a finding that the defendant intended by her actions to facilitate further abuse to her son and aided Jacobsen in the commission of that abuse.

■ The defendant contends that she was not proved guilty of murder beyond a reasonable doubt under a theory of accountability because she was not present during any of the abuse to Bobby or at the time of his murder. The defendant further argues that she did not participate in the infliction of any of the injuries to Bobby.

Evidence that a defendant was present at the commission of an offense, without disapproving or opposing it, is often considered in connection with other circumstances to reach the conclusion that a defendant aided in the commission of a crime. (*People v. Cole* (1977), 50 Ill. App. 3d 133, 365 N.E.2d 133, *cert. denied* (1978), 435 U.S. 944, 55 L. Ed. 2d 541, 98 S. Ct. 1526.) In other words, the defendant's presence at the actual scene of the crime is one factor which a trier of fact may consider to determine whether the defendant can be held accountable as an abettor. However, a defendant can be found to have aided and abetted without actively participating in the overt act. (*People v. Clark* (1963), 30 Ill. 2d 67, 195 N.E.2d 157.) By furthering a common purpose, a defendant becomes criminally liable for wrongdoings committed by a codefendant, even though he did not participate in the overt act itself. *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, *cert. denied* (1977), 434 U.S. 927, 54 L. Ed. 2d 287, 98 S. Ct. 411.

Neither the language of the accountability statute, nor the cases interpreting the statute, mandate that a defendant must be present or must actively participate in the offense in order to be held accountable. The defendant's purported absence during the infliction of abuse to Bobby or his murder was only one piece of evidence which the trial court considered in its determination of the defendant's knowledge of the abuse. As we have already described in detail, there was sufficient other evidence upon which the trial court properly based its finding of the defendant's accountability.

■ Finally, the defendant contends that she cannot be held accountable for Bobby's murder because she did not "specifically intend to facilitate" Bobby's abuse. We first note that the language of the accountability statute requires that the defendant aid in the

commission of an offense "with the intent to promote or facilitate such commission." (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).) Contrary to the defendant's contention, there is no requirement of specific intent in the statute.

The defendant relies upon language from *People v. Ware* (1980), 82 Ill. App. 3d 297, 402 N.E.2d 762, and *People v. Hoskins* (1990), 203 Ill. App. 3d 45, 560 N.E.2d 1004. However, both *Ware* and *Hoskins* are distinguishable from the case at bar. In *Ware*, the appellate court reversed the trial court's finding of accountability because the circumstantial evidence was insufficient to link the defendant with two murders committed by his roommate. (*Ware*, 82 Ill. App. 3d at 307, 402 N.E.2d at 769.) The court found that the evidence did not establish, beyond a reasonable doubt, that the murders were committed by two people, that the defendant was present at the time of the murders, or that the defendant agreed to participate, or aided the defendant in the commission of the offense. *Ware*, 82 Ill. App. 3d at 306, 402 N.E.2d at 769.

Similarly, in *Hoskins*, the appellate court reversed the trial court's finding of accountability for aggravated criminal sexual assault committed by the codefendant. (*Hoskins*, 203 Ill. App. 3d at 54, 560 N.E.2d at 1010.) The court reasoned that the defendant was not present at the time the victim was sexually assaulted by the codefendant and the evidence failed to establish a "common plan or scheme" between the defendant and the codefendant that the codefendant would sexually assault the victim prior to the defendant's arrival at the scene. *Hoskins*, 203 Ill. App. 3d at 54, 560 N.E.2d at 1010.

In both cases, the appellate court reversed the trial courts' finding of accountability because there was insufficient evidence in the record to support a finding that the defendants aided in the commission of the offenses. The case at bar is more analogous to *People v. Ray* (1979), 80 Ill. App. 3d 151, 399 N.E.2d 977, in which the appellate court upheld the trial court's conviction of a mother for the murder of her 17-month-old daughter by her boyfriend under a theory of accountability. While the mother in *Ray* was present during the abuse to her child, and on one occasion had beaten the child herself, the court stated:

> "Even in the absence of any evidence that defendant committed an overt act, the trier of fact could still have found her accountable for the actions of [the codefendant] where uncontradicted evidence established her continued close association with [the codefendant] and her failure to report to authorities any of the incidents of [the codefendant's] abuse of [her daughter].

The foregoing was evidence that defendant shared the common purpose of [the codefendant] and was sufficient to sustain her conviction for the acts of [the codefendant]." (*Ray*, 80 Ill. App. 3d at 156, 399 N.E.2d at 981.)

As we have discussed at length earlier in this opinion, the evidence in the instant case similarly supports the trial court's decision to sustain the defendant's conviction for the acts of Jacobsen.

■ The defendant next argues that since the defendant lacked the intent to facilitate Bobby's abuse, her conviction must be based upon her own conduct which, at worst, would result in an involuntary manslaughter conviction. As we have already determined that the evidence supports a finding of the defendant's intent to facilitate the abuse of her son, this argument is without merit.

■ The defendant further alleges that the trial court committed reversible error by allowing Dr. Jones, the medical examiner, to testify that Bobby's physical condition at the time of autopsy was the direct result of on-going abuse and that his injuries were the result of intentional acts. The defendant contends that Dr. Jones' opinions were beyond the scope of her expertise and without factual basis.

We believe that Dr. Jones' testimony was proper. Dr. Jones was a forensic pathologist and board certified in anatomic, clinical, and forensic pathology. Having conducted over 1,500 autopsies, more than 200 on children under the age of two years, Dr. Jones was competent to render an opinion on the question of whether Bobby's injuries were the result of intentional, on-going abuse.

Moreover, contrary to the defendant's contention that Dr. Jones' opinion lacked factual basis, the record reflects that Dr. Jones based her opinion that Bobby was a victim of on-going abuse on her own external and internal observations of Bobby's body on autopsy, as well as the pediatrician's records. The extensive bruising, the varying coloration of the bruises, the depth of bruising into the subcutaneous tissue, the weight loss and growth retardation were all factual support for Dr. Jones' opinion.

■ Finally, the State agrees with the defendant's contention that the trial court erred in entering judgments and imposing sentences on three counts of murder. Accordingly, we vacate the judgments and sentences which were imposed on counts IV and V of the indictments.

Affirmed in part; vacated in part.

JOHNSON and LINN, JJ., concur.