841 So.2d 292 (2002)
Ex parte C.G.
(In re C.G. v. State of Alabama).
1010249.
Supreme Court of Alabama.
April 19, 2002.
Rehearing Denied June 14, 2002.
Clifford W. "Chip" Cleveland II of Cleveland & Colley, P.C., Prattville, for petitioner.
Bill Pryor, atty. gen., and Yvonne A.H. Saxon, asst. atty. gen., for respondent.
*293 LYONS, Justice.
C.G. was convicted, as an accomplice, of sexual abuse in the first degree, a violation of § 13A-6-66, Ala.Code 1975, and was sentenced to seven years' imprisonment. The victim was her five-year-old daughter, A.D. The Court of Criminal Appeals affirmed C.G.'s conviction. C.G. v. State, 841 So.2d 281 (Ala.Crim.App.2001). We granted certiorari review to determine whether the Court of Criminal Appeals erred in holding that there was sufficient evidence from which a jury could have concluded that C.G. intended to promote or to assist A.D.'s father in the commission of sexual abuse. For the reasons stated below, we affirm the judgment of the Court of Criminal Appeals.

I.
The facts as described in the Court of Criminal Appeals' opinion are as follows:
"The evidence adduced at trial indicated that in 1997, A.D. lived with her mother, [C.G.], in a mobile home in Prattville. A.D. testified that her father, M.D., `sometimes' stayed with them in the mobile home. (R. 24, 32.) According to A.D., on two or three occasions, when her father was visiting, he `hurt [her] on [her] private.' (R. 25.) A.D. specifically testified regarding an incident that occurred while she, [C.G.], and her father were outside watching a comet. A.D. stated that while she was watching the comet with her parents, [C.G.] went inside to prepare dinner, leaving her alone outside with her father. After her mother went inside, A.D. said, her father placed her on the car and `rubbed on [her] private.' (R. 26.) A.D. testified that she could not remember the name for the part of her father's body that he used to rub her, but stated that `it was his private.' (R. 28.) A.D. also testified about a second occasion of sexual abuse by her father, which, she said, occurred when [C.G.] again left her alone with her father. A.D. stated that she had told [C.G.] on two separate occasions that her father had hurt her, specifically that he had hurt her privates. A.D. also said that she no longer refers to [C.G.] as her `mama' because [C.G.] `didn't protect [her]' from her father's abuse and because [C.G.] `wasn't the right mother that she was supposed to be.' (R. 29.)
"Barbara J. Morris, a social worker with the Autauga County Department of Human Resources assigned to the Child Protective Services Unit, testified that she became involved in A.D.'s case in April 1997, when her office received a telephone call reporting that A.D. had been sexually abused. Morris testified that she initially interviewed A.D. at her office to determine whether to involve law-enforcement officers. During that interview, Morris said, A.D. revealed that her father had sexually abused her. After contacting the proper authorities, Morris then telephoned [C.G.] and requested that A.D., who had been placed in the custody of [C.G.'s] sister when the allegations were initially reported, be allowed to remain with [C.G.'s] sister until the investigation was complete. Morris stated that she requested this arrangement because A.D. had indicated to her that [C.G.] and her father had frequent contact and because A.D. had told her that [C.G.] had known of the abuse and had failed to take any action to protect her or to prevent further instances of abuse.
"Morris testified that she subsequently met with [C.G.] in person at [C.G.'s] place of employment. According to Morris, at that time, she gave [C.G.] the option of regaining custody of A.D. if she agreed to keep A.D. away from her *294 father. However, because [C.G.] was unable to assure Morris that she would terminate all contact with A.D.'s father, A.D. remained in her aunt's custody with [C.G.'s] approval. The record reflects that, at [C.G.'s] request, A.D. was later removed from her aunt's home and sent to live with her uncle, [C.G.'s] brother, L.G., and his wife, J.G.1 Morris testified that [C.G.] had told her that she would not discontinue contact with A.D.'s father because she would not believe the allegations unless she heard them from A.D.
"Morris also testified that, during her meeting with [C.G.], she requested that [C.G.] not mention to A.D.'s father the allegations of sexual abuse until the investigation was complete. According to Morris, [C.G.] refused to cooperate, telling Morris that A.D.'s father `needed to know.' (R. 91.) In addition, during the interview, [C.G.] corroborated A.D.'s allegations that there were occasions when A.D. was alone with her fatheronce when [C.G.] went to feed a neighbor's dog and once when [C.G.] left the house to pick up a pizza for dinner.
"Morris further testified that she arranged a meeting between A.D., [C.G.'s] sister-in-law, and [C.G.]. Morris was also present at the meeting. During the meeting, Morris said, A.D. stated that she had told [C.G.] about her father's abuse. According to Morris, [C.G.] did not appear shocked upon hearing A.D.'s statement, she merely asked when A.D. had told her about the abuse.
"Morris also indicated that her office had supervised monthly visits between A.D. and [C.G.] According to Morris, the visits were hostile. Morris said that A.D. had to be physically forced into the room with [C.G.] on more than one occasion; that A.D. had refused to enter the room with [C.G.] unless Morris was present; and that once in the room, A.D. had very little interaction with [C.G.].
"Morris stated that during her investigation of the abuse of A.D., she discovered that there had been a previous allegation of sexual abuse made against A.D.'s father by another victim in 1993. Although the prior report indicated a finding of sexual abuse, Morris said, the district attorney's office had elected not to prosecute the case. However, according to Morris, when the present allegations arose, the district attorney initiated prosecution on the 1993 charge, and A.D.'s father pleaded guilty to that charge in exchange for charges pending against him in Autauga County alleging the sexual abuse of A.D. being dropped.2 After concluding her investigation, Morris said, she was of the opinion that A.D. had been sexually abused.
"Sharon Peggins, also a social worker with the Autauga County Department of Human Resources, testified that in October 1993 she investigated A.D.'s father in connection with the sexual abuse of a five-year-old girl who was the daughter of a family friend. Peggins stated that after conducting the investigation, she filed a disposition report in which she concluded that the victim had been sexually molested by A.D.'s father. Peggins testified that during an interview on October 4, 1993, with [C.G.], who was living with A.D.'s father at the time, [C.G.] stated that after learning of the allegations, she had moved to Montgomery to live with her parents because she feared that her own children might be removed from her custody. Peggins stated that [C.G.] told her that A.D.'s father `normally tended to be attached to young girls between the ages of four and five,' and that A.D.'s father was uncomfortable bathing or performing other personal care tasks for A.D. (R. 69.)
*295 "Peggins testified that she spoke with [C.G.] again on October 7, 1993, when [C.G.] telephoned her. During this conversation, Peggins said, [C.G.] stated that after discussing the allegations with A.D.'s father, she and A.D.'s father had decided that the victim needed to go to the doctor to be examined. Peggins stated that [C.G.] also said that she needed to have A.D. examined as well because A.D.'s father had `told her that he wasn't sure.' (R. 71.) Peggins testified that she was concerned about A.D. at that time because of her father's admission that he might have molested the first victim; however, because she felt [C.G.] was aware of the situation and would take any measures necessary to protect A.D., she did not start a file for A.D. at that time.
"J.G., A.D.'s aunt and [C.G.'s] sister-in-law, also testified at the trial. According to J.G., at the time of the trial A.D. had lived in her home for approximately four years pursuant to a temporary custody order. J.G. said that when A.D. first came to live with her, she was generally afraid of men. J.G. also stated that on the first day A.D. was in her custody, A.D. made unsolicited disclosures regarding the sexual abuse by her father, and told her that she had repeatedly told [C.G.] about that abuse, but that [C.G.] had failed to help her. J.G. testified that A.D. told her that when she told [C.G.] what her father had done to her, [C.G.] had responded that `she [C.G.] liked it when Daddy did that to her.' (R. 60.) J.G. also testified that A.D. had said that on another occasion when she had told [C.G.] that her father had hurt her, [C.G.] said, `[W]ell, Daddy did a bad thing.' (R. 61.)
"J.G. testified that when she and her husband accompany A.D. on court-ordered visitation with [C.G.], A.D. attempts to avoid [C.G.]. According to J.G., A.D. now refers to her as `mama' and to her uncle as `daddy.' (R. 50.) J.G. also testified that when A.D. refers to her `privates,' she is talking about her vaginal area. (R. 62.)
"[C.G.] testified in her own defense at trial. She stated that she was not `100 percent' sure of A.D.'s father's guilt either in the present case or in the 1993 case. (R. 138, 168.) [C.G.] denied that she had ever told A.D. that it feels good when A.D.'s father rubs her privates. According to [C.G.], the only complaint A.D. made to her was in January 1997 when, she said, A.D. confronted both her and A.D.'s father and accused A.D.'s father of hurting her `coochie.' (R. 139.) However, according to [C.G.], while relating the story, A.D. said that the injury was accidental. [C.G.] said that A.D. told her that the injury occurred while she was jumping on her father's back to wake him and her father accidentally fell against her and she hit the wall.
"[C.G.] admitted that she had left A.D. alone with her father on two occasions. On the first occasion, [C.G.] said, she left A.D. alone with her father for approximately 20 minutes while she went to a neighbor's house to feed the neighbor's dog. She stated that A.D.'s father was grading A.D.'s work in a preschool workbook when she left, and that when she returned, four pages of the workbook had been completed and A.D. was excited because she had received an `A' on a page where she had gotten all of the answers correct. (R. 147.) [C.G.] also said that she had left A.D. alone with her father on another occasion when she went to pick up a pizza. [C.G.] testified that when she left A.D. alone with her father on those two occasions, she had no idea that A.D. was going to be abused, and that because A.D. is a very verbal child, she believed *296 that A.D. would have relayed any unusual occurrence upon her return. According to [C.G.], she had never heard the content of A.D.'s testimony at any time before the trial.
"[C.G.] admitted, however, that when informed by Barbara Morris that it would be in her best interest not to tell A.D.'s father about the allegations, she had stated that she had never lied to A.D.'s father and that she would not start by keeping the allegations from him. She also stated that at A.D.'s father's trial in Montgomery County, she had testified that she did not fully believe that he had ever molested A.D. According to [C.G.], the allegations in Montgomery County arose out of the vindictiveness of the mother of A.D.'s father's first victim, who, [C.G.] said, was the first person to speak to A.D. about the abuse, and who contacted A.D.'s aunt and the Department of Human Resources. [C.G.] said that she had watched A.D.'s father's behavior from 1993 to 1997 and that she had never seen any inappropriate actions. [C.G.] testified that she did not feel that she had done anything wrong by leaving A.D. alone with her father.
"[C.G.] admitted, however, that at the time the allegations against A.D.'s father arose in 1993 regarding the first victim, A.D.'s father had been drinking heavily and he had indicated to her that he `was afraid that if he could do something like that to [the victim] while he was in a drunken stupor, that there was a chance that he could have done something to his daughter.' (R. 145.) [C.G.] stated that she had had A.D. examined at that time, and that she had promised her family that she would not leave A.D. alone with her father.
1. "L.G. and J.G. had custody of A.D. at the time of the trial.
2. "Although the charges against A.D.'s father in Autauga County were dropped, the record reflects that he was indicted and convicted on a charge of sexual abuse of A.D. that occurred while they were visiting his mother at her residence in Montgomery County."
841 So.2d 283-86.

II.
C.G. was convicted of sexual abuse based upon a theory of accomplice liability. Specifically, the jury found that C.G. was legally accountable for M.D.'s actions because C.G. failed to protect A.D. from sexual abuse, in violation of § 13A-2-23(3), Ala.Code 1975. Section 13A-2-23(3) provides:
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:

". . . .
"(3) Having a legal duty to prevent the commission of the offense, [she] fails to make an effort [she] is legally required to make."
(Emphasis added.) C.G. contends that the Court of Criminal Appeals erred in holding that there was sufficient evidence from which a jury could conclude that she intended to promote or to assist A.D.'s father in committing sexual abuse.
In affirming C.G.'s conviction, the Court of Criminal Appeals relied upon five cases, each recognizing a duty on the part of a parent to care for and protect his or her child from physical or sexual abuse by a third party. See Lundman v. McKown, 530 N.W.2d 807, 820 (Minn.Ct.App.1995); People v. Peters, 224 Ill.App.3d 180, 190, 586 N.E.2d 469, 476, 166 Ill.Dec. 511, 518 (1991), aff'd, 153 Ill.2d 218, 606 N.E.2d 1201, 180 Ill.Dec. 124 (1992); State v. Williquette, 129 Wis.2d 239, 385 N.W.2d 145 (1986), aff'd, 129 Wis.2d 239, 385 N.W.2d *297 145 (1986); State v. Walden, 306 N.C. 466, 293 S.E.2d 780 (1982); and State v. Ainsworth, 109 N.C.App. 136, 426 S.E.2d 410 (1993). After carefully reviewing each of the above cases, we find only People v. Peters applicable to C.G.
Although Peters is a murder case and the evidence of the defendant's knowledge that her child had been abused was arguably stronger in that case, the Illinois appellate court's analysis of the sufficiency of the evidence proving intent is relevant in our review of C.G.'s culpability. In Peters, the defendant was convicted, under a theory of accountability, of murder, aggravated battery of a child, cruelty to a child, and endangering the life of a child. 224 Ill. App.3d at 181, 586 N.E.2d at 470, 166 Ill.Dec. at 512. On appeal, the defendant argued that the State had failed to prove that she could be held accountable for the murder of her son because she was not present when he was killed by her boyfriend and because she did not perform any act specifically intending to facilitate his murder. Id.
Karen Wagner, the child's former babysitter, testified for the State. Wagner testified that shortly after the defendant began dating Kenneth Jacobsen she noticed bruises on the child's buttocks. 224 Ill. App.3d at 182, 586 N.E.2d at 471, 166 Ill.Dec. at 513. Wagner questioned the defendant about the bruises, and the defendant told her that the child had probably fallen at home while he was learning to walk. On another occasion Wagner noticed bruises on the child's cheeks, chin, and forehead. Id. On this occasion, Wagner questioned Jacobsen about the bruises and was told that the child had fallen off the ladder to a slide. Id.
During the course of babysitting for the child, Wagner noticed several other bruises including "bumpy-like welts" scattered around the center of the child's back, cuts on the child's lip, and a burn that went "from the top of his scalp down his neck and one shoulder." 224 Ill.App.3d at 182-83, 586 N.E.2d at 471, 166 Ill.Dec. at 513. Wagner testified that the defendant told her that she had taken the child to the hospital for treatment for the burn; however, hospital records showed that the child had never been admitted for burn treatment. 224 Ill.App.3d at 183-87, 586 N.E.2d at 471-74, 166 Ill.Dec. at 513-16. Wagner also testified that the defendant told her that Jacobsen was going to be arrested for child abuse. When the child's burns went untreated, Wagner telephoned the Department of Children and Family Services ("DCFS") and reported the child's bruises and burns. 224 Ill.App.3d at 183, 586 N.E.2d at 471-72, 166 Ill.Dec. at 513-14.
After learning that Wagner had reported the abuse, the defendant became angry with Wagner and refused to allow Wagner to babysit for the child. 224 Ill.App.3d at 184, 586 N.E.2d at 472, 166 Ill.Dec. at 514. On the night of the child's death, the defendant left her home around 6:30 p.m. to go drinking with one of her girlfriends. 224 Ill.App.3d at 186, 586 N.E.2d at 473, 166 Ill.Dec. at 515. She left the child in Jacobsen's care. The defendant returned home three hours later but did not look in on the child. When the defendant awoke the next morning, Jacobsen told her that they had to take the child to the hospital because he had turned blue. The child had suffered a bilateral, subdural hematoma, which resulted from blunt head trauma; he died from his injuries. Id.
The State's pathologist testified that to cause the head injury the child sustained, his head would have to have been forcibly smashed against a tabletop, countertop, or wall. 224 Ill.App.3d at 188, 586 N.E.2d at 475, 166 Ill.Dec. at 517. An autopsy revealed 45 areas of bruising on the child's *298 body. 224 Ill.App.3d at 185-86, 586 N.E.2d at 473, 166 Ill.Dec. at 515. The autopsy also revealed that the physical abuse had started when the child was 15 months of age, approximately the time that the defendant had begun dating Jacobsen. Id.
The defendant told investigators that when she worked, she would routinely leave the child in Jacobsen's custody. 224 Ill.App.3d at 188, 586 N.E.2d at 475, 166 Ill.Dec. at 517. The defendant also stated that when she came home from work and saw the child's bruises, she accepted Jacobsen's explanation that the child was clumsy and was prone to falling down. Id. The outpatient registrar at the hospital to which the child was admitted on the morning of his death testified that she overheard the defendant say to Jacobsen, "`I told you not to get so angry, I told you not to get so angry, I told [you] this would happen.'" 224 Ill.App.3d at 187, 586 N.E.2d at 474, 166 Ill.Dec. at 516.
The defendant testified that she never saw Jacobsen abuse her son and that she never willfully caused or permitted Jacobsen to abuse the child. 224 Ill.App.3d at 188, 586 N.E.2d at 475, 166 Ill.Dec. at 517. The defendant stated that Jacobsen never struck her and that she never saw Jacobsen hit or strike her son. She also testified that she never saw Jacobsen get angry with the child or reprimand him. Id.
The Illinois accountability statute under which the defendant was charged provided, in pertinent part:
"`A person is legally accountable for the conduct of another when:
"`(c) Either before or during commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.'"
224 Ill.App.3d at 190, 586 N.E.2d at 476, 166 Ill.Dec. at 518 (quoting Ill.Rev.Stat. 1985, ch. 38, par. 5-2(c)); see also 720 ILCS 5/5-2 (emphasis added).[1] Although the language of Alabama's complicity statute does not mirror that of the Illinois accountability statute, both require proof that the defendant intended to engage in the conduct prohibited. See § 13A-2-23, Ala.Code 1975. In determining whether the evidence was sufficient to prove that the defendant intended "to promote or facilitate" the physical abuse and death of her son, the Appellate Court of Illinois considered the substantial evidence showing that the defendant knew about the abuse Jacobsen had inflicted upon her son and did nothing to intervene. 224 Ill. App.3d at 190-91, 586 N.E.2d at 477, 166 Ill.Dec. at 519.
Evidence of the defendant's knowledge in Peters included Wagner's discussion of the child's injuries with the defendant, the inconsistent explanations Jacobsen or the defendant gave of the cause of the child's injuries, the defendant's firing Wagner as babysitter for the child after Wagner reported the injuries to the DCFS, the 45 areas of bruising on the child's body that were at least a week old at the time of his death, visible bruising on his hands and face the day before his death, and the defendant's statement to Jacobsen at the emergency room, which illustrated her awareness of the previous abuse of the child. 224 Ill.App.3d at 191-92, 586 N.E.2d at 476-77, 166 Ill.Dec. at 518-19.
Based upon this evidence, the Peters court concluded that the defendant knew of the ongoing abuse her son had suffered at the hands of Jacobsen and that she *299 failed to take any action to protect her son. 224 Ill.App.3d at 191-92, 586 N.E.2d at 477, 166 Ill.Dec. at 519. Recognizing that the Illinois accountability statute required that the accused have the "intent to promote or facilitate the offense," the Court held that "[i]ntent may be gleaned from knowledge." 224 Ill.App.3d at 190, 586 N.E.2d at 476, 166 Ill.Dec. at 518. According to the Court, "[a] person who knows that his or her child is in a dangerous situation and fails to take action to protect the child, presumably intends the consequences of the inaction." Id. Applying this analysis, the Court concluded that the defendant's conduct satisfied the intent requirement of the statute; the Court reasoned that she intended to facilitate the offense because she knew that Jacobsen was abusing her son and she failed to intervene. Id.
Our research has revealed that the Peters rationale, specifically, that intent to abuse can be inferred from knowledge of abuse by another, has been cited with approval in one other jurisdiction. See Davis v. Commonwealth, 967 S.W.2d 574 (Ky.1998). Applying the Peters rationale, the Supreme Court of Kentucky affirmed the conviction of a defendant accused of first-degree criminal abuse. See Davis v. Commonwealth, 967 S.W.2d at 581. In Davis, the defendant had repeatedly left her two-year-old daughter in the care of her boyfriend. When she returned, the defendant often noticed bruises on the child's face, neck, and buttocks. 967 S.W.2d at 576-77. On the last occasion when the child was left alone with the defendant's boyfriend, the child sustained two large skull fractures and died the next afternoon. Id.
The defendant argued that the evidence was insufficient to support a jury's conclusion that she intentionally permitted her daughter to be abused. 967 S.W.2d at 581. Citing Peters, the Supreme Court of Kentucky held that intent could be gleaned from knowledge. According to the Court, there was ample evidence from which a reasonable juror could have concluded that the defendant knew her child was being abused when she was left alone with the defendant's boyfriend. Id.
C.G. was convicted of violating § 13A-2-23(3), complicity by omission or failure to act. She argues that, notwithstanding the Peters decision, the Commentary to § 13A-2-23(3) indicates that the Legislature did not intend to punish the accused for mere knowledge that a crime might occur. Rather, she argues, the mental state required to violate § 13A-2-23(3) is intent. According to C.G., her knowledge that M.D. sexually abused a child in the past does not in and of itself establish that C.G. intended to promote or assist him in sexually abusing A.D. C.G. contends that, at most, she is guilty of reckless endangerment.
The Commentary to § 13A-2-23(3) states:
"Subdivision (3) places liability in the situation where the defendant who has a legal duty to prevent the crime fails to do so with the intent to further the crime. Although apparently there is no recent Alabama case law on this point, it has been established in other common law jurisdictions. See, e.g., People v. Chapman, 62 Mich. 280, 28 N.W. 896 (1886) (husband who had induced another to seduce his wife stood by and did not interfere with subsequent rape). This would also comprehend the situation where a night watchman or policeman, if with an intent to aid the perpetrating party, stands by and neglects his duty to intervene. It should be noted that mere negligence in the night watchman situation would be insufficient for liability; one must also have the `intent *300 to promote or assist the commission of the offense.'"
§ 13A-2-23 Commentary, Ala.Code 1975 (emphasis added).
The watchman analogy, illustrating the differing degrees of culpability for one who has been accused of failing to make an effort to prevent the commission of an offense, distinguishes the conduct of a watchman who has been bribed to look the other way from the conduct of a merely careless watchman who sleeps on the job. The essential difference between the bribed watchman and the merely careless watchman is the lack of any benefit to the careless watchman from which one might infer an intent to aid in the commission of the offense.
C.G. maintains that her conduct is analogous to that of the merely careless watchman. In reaching its decision in Peters, the Appellate Court of Illinois was not faced with the precise statutory language found in § 13A-2-23(3), nor did it have the benefit of the Commentary addressing § 13A-2-23(3) to aid in the determination of the intent of the Legislature. Thus, in order to sustain C.G.'s conviction, we cannot hold, as did the Peters court, that C.G.'s knowledge of M.D.'s propensity for sexually abusing his daughter, standing alone, was sufficient to prove intent. Otherwise we would be punishing the merely careless watchman. In order to treat C.G. as other than a merely careless watchman, we must examine the evidence for a basis from which the jury could have concluded that she derived some benefit from failing to intervene and protect A.D. from her father's sexual abuse, thereby permitting the jury to infer that C.G. possessed the requisite intent to assist M.D.
This inquiry requires consideration of all of the circumstances surrounding the sexual abuse of A.D. These circumstances include C.G.'s knowledge that A.D. was being sexually abused by M.D. and C.G.'s reaction to that knowledge. This Court has held that "`"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution."'" Ex parte Tiller, 796 So.2d 310, 312 (Ala. 2001), quoting Ex parte Woodall, 730 So.2d 652, 658 (Ala.1998), quoting in turn Powe v. State, 597 So.2d 721, 724 (Ala.1991).
The State's evidence indicated that C.G. knew that M.D. had been accused in 1993 of sexually molesting a five-year-old child. C.G. was aware and even told social workers that M.D. tended to be attached to young girls between the ages of four and five and that M.D. was uncomfortable bathing or performing other personal-care tasks for A.D. Even more alarming, C.G. had had A.D. examined because she knew there was a possibility that M.D. might have sexually abused A.D. as early as 1993. C.G. moved out of the home that she shared with M.D. and promised family members that she would never allow A.D. to be alone with M.D. Nevertheless, C.G. and M.D. resumed contact a short time later.
M.D. was not a regular member of C.G.'s household in 1997; rather, he "sometimes" stayed with C.G. and her daughter in their mobile home. M.D. was left alone with A.D. on at least two occasions during this period. On those two occasions, M.D. sexually abused A.D. A.D. repeatedly told C.G. that M.D. had sexually abused her. On one such occasion, C.G. responded by stating that "[C.G.] liked it when Daddy did that to her." From this the jury could draw two conclusionsthat C.G. derived pleasure from the companionship of M.D. and that, at least on that occasion, not only was C.G. tolerant of *301 M.D.'s criminal activity, she tried to inculcate in A.D. a positive attitude toward it. Of course, the evidence on this point was inconsistent because there was evidence indicating that, on another occasion, C.G. told A.D. that "Daddy did a bad thing." In all events, C.G. did nothing to prevent the further sexual abuse of A.D. and refused to keep the child away from M.D. after the Department of Human Resources began investigating the allegations of sexual abuse.
The jury heard evidence indicating that C.G. knew that M.D. had been accused of sexual abuse in the past, that A.D. told C.G. that M.D. had sexually abused her, that C.G. failed to report the abuse to police or to seek medical attention for A.D., that C.G. continued her relationship with M.D. even after A.D. told her that M.D. had sexually abused her, and that C.G. continued to allow M.D. access to A.D. In sum, the jury could have reasonably believed that C.G. actually knew that M.D. was sexually abusing A.D. The jury could therefore have reasonably believed that C.G.'s conscious failure to protect A.D. on the two occasions in question showed that she intended to allow the sexual abuse to occur in order to maintain her relationship with M.D.
Viewing the evidence favorably to the State, as we must, we conclude that, in C.G.'s hierarchy of values, it was more important to enjoy a relationship with M.D. free of any confrontation over his danger to A.D. than it was to eliminate the risk to A.D. of sexual abuse by M.D. "Intent, we know, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence." Pumphrey v. State, 156 Ala. 103, 106, 47 So. 156, 157 (1908); see also Williams v. State, 795 So.2d 753 (Ala.Crim.App.1999); French v. State, 687 So.2d 202, 204 (Ala.Crim.App. 1995), rev'd on other grounds, 687 So.2d 205 (Ala.1996); McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986).
The circumstances of this case are therefore distinguishable from the hypothetical case of the merely careless night watchman in the Commentary to § 13A-2-23(3). C.G., having breached her duty to A.D. in order to enjoy the continued favor of M.D., is comparable to the bribed watchman consciously looking the other waynot the sleepy watchman who derives no benefit from his wrongdoing. While we do not embrace such standards as "probability," "substantial likelihood" or "very real possibility" included in the Court of Criminal Appeals' discussion of intent, we conclude that the Court of Criminal Appeals reached the correct result. Therefore, we affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
MOORE, C.J., and HOUSTON, JOHNSTONE, and WOODALL, JJ., concur.
NOTES
[1] The Illinois accountability statute was codified at Ill.Rev.Stat.1985, ch. 38, par. 5-2(c), when the Appellate Court of Illinois decided Peters; it is now found at 720 ILCS 5/5-2.